Michael MASSEY and John Otten, M.D., Plaintiffs–Appellants,

v.

David HELMAN, et al., Defendants–Appellees.

No. 99–1459.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1999.

Decided Nov. 2, 1999.

As Corrected Jan. 13, 2000.

Richard L. Steagall (argued) Nicoara & Steagall, Peoria, IL, for plaintiffs-appellants.

James A. Lewis (argued), Office of the United States Attorney, Springfield, IL, for defendants-appellees.

Before POSNER, Chief Judge, and BAUER and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

Michael Massey, a prisoner at the Federal Correctional Institution in Pekin, Illinois, brought this lawsuit under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) against federal prison officials for allegedly violating his rights under the Eighth Amendment by denying him surgical care for a hernia. One of the prison's staff physicians, Dr. John Otten, M.D., recommended that Massey have the hernia surgically repaired, but after making this recommendation, was fired from his job. After being terminated, Dr. Otten joined Massey's *Bivens* action and asserted one claim against the defendant prison officials arising from his discharge and two claims on behalf of inmates at the prison. The district court dismissed the lawsuit, and Massey and Dr. Otten now appeal. For the following reasons, we affirm.

## BACKGROUND

At last count, the United States Department of Justice Federal Bureau of Prisons ("BOP") is incarcerating 134,344 prisoners. *Federal Bureau of Prisons Weekly Population Report* (last modified Oct. 22, 1999) <http://www.bop.gov/weekly.html>. While housing enough people to populate a medium-sized American city, the BOP necessarily encounters prisoners with all varieties of health and medical problems. In an effort to care for its prisoners' medical complications in an orderly manner, the BOP has enacted a Program Statement entitled the Health Services Manual. The fundamental purpose of the Health Services Manual is to efficiently regulate the provision of medical, dental, and mental health services to federal prisoners so that inmates receive necessary health care from competent staff.

To manage the delivery of medical services to BOP inmates, the Health Services Manual describes a hierarchy of prison officials who are charged with administering medical services to all federal prisoners. The top dog in this chain of command is the BOP Medical Director. The current BOP Medical Director, Dr. Kenneth Morit Sugu, M.D. ("Dr. Sugu"), is "responsible for all health care delivered by [BOP] health care practitioners and U.S. Public Health Service officers." As Medical Director, Dr. Sugu's duties include "establishing health care programs ... regularly inspecting institution health care facilities and programs; and coordinating research activities related to health care." In other

words, Dr. Sugu oversees the general administration of all medical care to the 134,-344 federal prisoners in this country.

One step down from BOP Medical Director Dr. Sugu are individuals known as Regional Health Systems Administrators ("RHSAs"). Generally speaking, RHSAs serve as advisors to BOP Regional Directors in all areas of health care. Additionally, RHSAs are responsible for developing suggestions for medical policy revisions, performing management assessments, responding to correspondence and complaints from prisoners, and providing medical advice to BOP Regional Directors regarding the planning, development and construction of new BOP institutions.

At the institutional level, each BOP facility has its own Health Services Unit which is staffed with a Clinical Director, a Health Services Administrator, staff physicians, and other paraprofessional staff. The Clinical Director bears ultimate responsibility for clinical care provided at the institution. The Clinical Director also hires all staff physicians, monitors in-house continuing professional education for physicians, maintains medical records, and evaluates patient care. The institution's Health Services Administrator plans and controls all aspects of the Health Services Unit's daily administration. In cases where an inmate needs medical treatment that cannot be provided at the institution, the Health Services Administrator arranges for "outside" medical services to be performed at local hospitals. Finally, the Health Services Administrator also serves as the "direct avenue of communication between Health Services and the CEO, designee, Regional Office, and Central Office." Both the Clinical Director and the Health Services Administrator report directly to the Warden or Assistant Warden of the BOP facility.

In addition to establishing the hierarchy of prison officials who administer medical treatment to federal prisoners, the BOP Health Services Manual also creates health care standards to guide the provision of medical services to inmates. Specifically, the Health Services Manual defines the following four categories of medical care:

(LEVEL 1) *Medically mandatory* is defined as immediate, urgent or emergency care required to maintain or treat a life threatening illness or injury.

(LEVEL 2) *Presently medically necessary* is defined as routine care or treatment that cannot reasonably be delayed without the risk of further complication, serious deterioration, significant pain or discomfort, provided to maintain a chronic or non-life threatening condition.

(LEVEL 3) *Medically acceptable* but not medically necessary is treatment that is not exclusively for the convenience of the patient (routine hernia repair, noncancerous skin lesions, etc.).

(LEVEL 4) *Exclusively for the convenience of the inmate.* This level of care may include, but is not limited to, tattoo removal, minor nasal reconstruction, other cosmetic surgery, and elective circumcision.

(Emphasis in original). The BOP limits "the provision of surgical and medical procedures ... to cases that fall within levels (1) and (2). Procedures that fall into levels (3) and (4) shall not ordinarily be provided. Exceptions must be approved by the Medical Director."

It is in the context of this BOP medical care program that plaintiffs Michael Massey ("Massey") and Dr. John Otten, M.D. ("Dr. Otten") brought this lawsuit. Massey, a prisoner at the Federal Correctional Institute in Pekin, Illinois ("FCI Pekin"), developed an abdominal hernia while incarcerated as a pretrial detainee in the Marion County, Indiana prison. Sometime after sustaining this hernia, Massey came to FCI Pekin and began serving a 70 month term of imprisonment on March 26, 1996. During his incarceration at FCI Pekin, Massey worked as a barber in the prison barber shop and contends that the standing required by his work caused his hernia to worsen to the point that it inflicted considerable pain.

Dr. Otten worked as a staff physician at FCI Pekin and examined Massey on August 5, 1996. Dr. Otten determined that Massey should undergo surgery to repair his hernia and communicated this opinion to FCI Pekin's Health Services Administrator, Ferdinand Somalia ("Somalia"). As the Health Services Administrator, it was Somalia's responsibility to arrange for the surgery to be performed at a local hospital. Nevertheless, even though Dr. Otten recommended that Massey undergo surgery, neither Somalia nor any other prison official arranged for Massey to have his hernia surgically repaired.

Because he was not receiving surgical treatment for his hernia, Massey initiated this *Bivens* action on November 7, 1997, both individually and as a class action. Massey claimed that FCI Pekin and the BOP administer policies that are deliberately indifferent to prisoners' medical needs and therefore violate their rights under the Eighth Amendment. Massey predicated his claims of unconstitutional medical policies on the medical care structure established by the BOP Health Services Manual. Massey complained that FCI Pekin and the BOP have unconstitutional medical policies of (1) prohibiting the surgical repair of hernias; (2) authorizing only the BOP Medical Director to approve the surgical repair of a hernia; and (3) depriving prison physicians of control over medical treatment that they order to be performed by consulting physicians. Massey and the putative class sought money damages and injunctive relief for these allegedly cruel and unusual prison policies.[1]

As Massey's lawsuit proceeded, the district court ordered Dr. Otten's deposition to be taken on January 21, 1998. However, just one day before Dr. Otten's deposition was scheduled, FCI Pekin's assistant warden, Miguel Gonzalez ("Gonzalez"),

suspended Dr. Otten from his job as a staff physician and placed Dr. Otten on home duty pending a review of charges that Dr. Otten had administered inadequate medical care to inmate-patients. Gonzalez then recommended that Dr. Otten's employment be terminated. This recommendation was reviewed by FCI Pekin's warden, David Helman ("Helman"), who accepted Gonzalez' recommendation and terminated Dr. Otten's employment as a staff physician at FCI Pekin on February 26, 1998.

A few weeks after being fired, Dr. Otten joined Massey's lawsuit. According to Dr. Otten, Massey's case was not the first time that he had openly protested the prison's refusal to administer medical treatment that he recommended. Dr. Otten alleged that the prison officials violated his First Amendment rights by terminating him in retaliation for speaking about a matter of public concern. In addition to his own First Amendment claim, Dr. Otten asserted two claims on behalf of his inmate-patients. Specifically, Dr. Otten charged that prison officials violated his inmate-patients' First Amendment right to have access to the courts and their Eighth Amendment right to receive medically necessary treatment.

The defendant prison officials moved to dismiss Massey's and Dr. Otten's complaint.[2] The prison officials argued that Massey could not pursue his claim because he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act. Defendants also asserted that Dr. Otten could not maintain the claim that he was fired in retaliation for opposing the refusal of surgical care for Massey's hernia because the Civil Service Reform Act is Dr. Otten's exclusive remedy for constitutional violations related to his federal employment. Finally, defen-

---

1. Finding that he failed to satisfy the "numerosity" requirement of Federal Rule of Civil Procedure 23(a)(1), the district court denied Massey's motion for class certification on July 7, 1998.

2. The complaint at issue is the Fourth Amended Complaint filed in the lawsuit.

dant prison officials maintained that Dr. Otten lacked standing to assert the rights of his inmate-patients' in his remaining two claims. The district court agreed with each of defendants' arguments and dismissed the action. By the time the district court dismissed this lawsuit, Massey had received surgery for his hernia.

## ANALYSIS

■ Because the district court dismissed this case at the pleadings stage, we review the dismissal *de novo*, and accept all well-pleaded allegations as true. *Kaplan v. Shure Bros., Inc.*, 153 F.3d 413, 417 (7th Cir.1998). We draw all reasonable inferences in the plaintiffs' favor, and will affirm the dismissal only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Gossmeyer v. McDonald*, 128 F.3d 481, 489 (7th Cir.1997) (quoting *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir.1997)). With these standards in mind, we address the issues presented for our review.

## I. Massey's Eighth Amendment Claim

In Count I of the Fourth Amended Complaint, Massey alleged that the prison officials violated the Eighth Amendment's ban on cruel and unusual punishment by refusing to surgically repair his hernia. The district judge held that the Prison Litigation Reform Act ("PLRA") required Massey to first exhaust his administrative remedies before bringing a lawsuit. Because Massey's complaint failed to allege that he had sought any administrative relief before bringing his lawsuit, the court dismissed his claim. Massey contends that the district court misconstrued the PLRA's exhaustion requirement and asks us to vacate the dismissal of his claim.

■ Before we reach the exhaustion issue, we must first address a jurisdictional concern raised in Massey's brief. Massey observes that the district court "noted ... but did not resolve" the issue of whether the PLRA's exhaustion requirement is "jurisdictional" or a "threshold requirement" such as a statute of limitations. We can make short work of this jurisdictional concern simply by citing our recent decision in *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532 (7th Cir.1999). In *Perez*, we held that a prisoner's failure to exhaust administrative remedies under the PLRA does not deprive federal courts of subject matter jurisdiction. *Id.* at 535. Rather, as we explained in *Perez*, so long as a prisoner has a federal claim and the failure to exhaust is not essential to the claim or the claim's ripeness, then 28 U.S.C. §§ 1331 and 1343 give the court subject matter jurisdiction. *Perez*, 182 F.3d at 535–36. In this case, Massey asserts an Eighth Amendment claim and his failure to exhaust administrative remedies is neither an essential element of his claim nor does it affect his claim's ripeness. Therefore, the district court had, and this court now has, proper federal subject matter jurisdiction over Massey's claim.[3] *See Perez*, 182 F.3d at 536.

■ Having satisfied ourselves of our jurisdiction, we turn to Massey's argument that the PLRA did not require him to exhaust his administrative remedies before filing suit. The relevant section of the PLRA provides that:

[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Massey argues that the PLRA's exhaustion requirement does

---

**3.** Since we are discussing jurisdiction, it is worth noting that this court has appellate

jurisdiction under 28 U.S.C. § 1291.

not apply to him because his lawsuit seeks money damages and there is no administrative procedure in which he can collect monetary compensation. Massey insists that money damages are the only appropriate damages because his hernia has been surgically repaired and any injunctive relief would therefore be meaningless. Thus, according to Massey, there is no administrative remedy "available" to him within the meaning of the PLRA because no administrative procedure can afford him any worthwhile relief. Massey theorizes that because there is no meaningful administrative remedy available to him, he is not required to exhaust any administrative procedures before filing a lawsuit.

■ Again, we need not spend much time on this argument. In *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532 (7th Cir.1999), this court held that there is no futility exception to the PLRA's exhaustion requirement. *Id.* at 537. The PLRA plainly requires prisoners to exhaust "such administrative remedies as are available" before bringing a lawsuit complaining of prison conditions. 42 U.S.C. § 1997e(a). Contrary to Massey's suggestion, the PLRA does not condition the applicability of the exhaustion requirement on the effectiveness of the administrative remedy available in a given case. *See Alexander v. Hawk*, 159 F.3d 1321, 1326 (11th Cir.1998). Rather, as we noted in *Perez*, "the statutory question is whether any 'remedies' are 'available'; § 1997e(a) does not require the prison to use the prisoner's preferred remedy." *Perez*, 182 F.3d at 537. Thus, if a prison has an internal administrative grievance system through which a prisoner can seek to correct a problem, then the prisoner must utilize that administrative system before filing a claim. The potential effectiveness of an administrative response bears no relationship to the statutory requirement that prisoners first attempt to obtain relief through administrative procedures.

Employing a "never say die" strategy, Massey argues that even if he had sought administrative relief before filing suit, no administrative response could have corrected the cruel and unusual punishment that he endured. In other words, in addition to being unable to provide money damages, Massey claims that no administrative complaint could have prompted prison officials to authorize the surgery he sought for his hernia. Thus, Massey argues that because no remedy was "available" for his medical condition, he did not have to exhaust the BOP's available administrative procedures.

Massey constructs his argument on a somewhat hyper-technical reading of the federal regulations that govern administrative complaints within the BOP and the BOP's Health Services Manual. Massey first points out that the regulations which authorize administrative complaints, 28 C.F.R. §§ 542.10—542.19, will only direct Massey's medical concerns to the FCI Pekin staff, the BOP Regional Director, and ultimately to the BOP's General Counsel. Massey emphasizes that these administrative regulations do not explicitly require the BOP Medical Director to review complaints about inmate medical care. Massey then notes that, under the Health Services Manual, only the BOP Medical Director can authorize an exception to the Health Services Manual's general prohibition of surgical repair for hernias. Thus, Massey argues that because the regulations do not expressly require the BOP Medical Director to review every administrative appeal concerning medical care, there is no way he could have had his hernia surgery authorized by the Medical Director.

Massey's argument, while creative, misses the mark; it once again confuses the "effectiveness" of an administrative procedure with the "availability" of one. As we have already concluded, whether the administrative process actually produces a result that satisfies the inmate is not the appropriate inquiry. Instead, courts

merely need to ask whether the institution has an internal administrative grievance procedure by which prisoners can lodge complaints about prison conditions. If such an administrative process is in place, then § 1997e(a) requires inmates to exhaust those procedures before bringing a prison conditions claim.

On this issue, we once again agree with the reasoning in *Alexander v. Hawk*. In *Alexander*, the Eleventh Circuit concluded that the term "available" in § 1997e(a) "is used to acknowledge that not all prisons actually have administrative remedy programs. Some state penal institutions may not have an administrative remedy program to address prison conditions, and thus there are no 'available' administrative remedies to exhaust." *Alexander*, 159 F.3d at 1326–27. Here, as in *Alexander* and *Perez*, the BOP provides an administrative process "through which inmates may seek formal review of an issue which relates to any aspect of their confinement." 28 C.F.R. § 542.10. The BOP's administrative remedy program "applies to all inmates confined in institutions operated by the Bureau of Prisons." *Id.* The program provides for a first step of "informal resolution," 28 C.F.R. § 542.13, then appeals to the BOP Regional Director and eventually the BOP General Counsel. 28 C.F.R. § 542.15. Because Massey had this administrative procedure at his finger tips, but failed to utilize it, the district court correctly found that Massey failed to exhaust his administrative remedies under 42 U.S.C. § 1997e(a) and properly dismissed Massey's Eighth Amendment claim.

Citing dicta from our decision in *Perez*, Massey also pressed a unique theory at oral argument to escape the exhaustion requirement. In *Perez*, Judge Easterbrook gave the following hypothetical:

[s]uppose [a] prisoner breaks his leg and claims delay in setting the bone is cruel and unusual punishment. If the injury

has healed by the time suit begins, nothing other than damages could be a "remedy," and if the administrative process cannot provide compensation then there is no administrative remedy to exhaust.

*Perez*, 182 F.3d at 538. Massey argues that he exemplifies the imaginary prisoner in Judge Easterbrook's illustration because he has already received the surgical repair of his hernia. Massey therefore contends that, since his hernia has been repaired, only money can serve as a remedy and monetary compensation is unavailable through the BOP's administrative system. If he cannot get monetary damages from the BOP, then Massey insists that there is no administrative remedy to exhaust.

Close, but no cigar. Unlike the lame prisoner in Judge Easterbrook's hypothetical whose leg healed *before* he filed suit, Massey's injury did not heal *"by the time suit begins." Perez*, 182 F.3d at 538 (emphasis added). Rather, Massey's hernia was still causing him problems when he filed his lawsuit on November 7, 1997. In fact, Massey did not receive surgery until January 28, 1998, several months after he filed his lawsuit. In contrast to the imaginary prisoner in *Perez* for whom *only* money would serve as a remedy, Massey could have availed himself of administrative remedies that may have resulted in the surgical repair of his hernia before he filed suit. Because Massey's physical ailment lingered long past the date he filed his lawsuit, the dicta in *Perez* does not relieve him of his obligation to exhaust his administrative remedies before bringing his claim.

■ Before we can leave Massey's appeal behind and move on to consider Dr. Otten's claims, one more of Massey's arguments deserves attention. Massey contends that defendants waived their right to raise exhaustion of administrative remedies as a basis for dismissal.[4] Massey

---

**4.** Ironically, if anybody waived an argument in this case, it appears that Massey waived the

right to present his waiver argument to this court. The record contains no indication that

premises this argument on the fact that defendants did not plead failure to exhaust administrative remedies as an affirmative defense to his Amended Complaint and Second Amended Complaint.

A prisoner's failure to exhaust administrative remedies before filing a claim constitutes an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure. *See Jenkins v. Haubert*, 179 F.3d 19, 29 (2d Cir.1999); *King v. Cooke*, 26 F.3d 720, 724 (7th Cir.1994). Because failure to exhaust administrative remedies is an affirmative defense, defendants have the burden of pleading and proving the defense. *See, e.g., Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir.1997) (Title VII case noting that "failure to exhaust administrative remedies is an affirmative defense [and] the defendant bears the burden of pleading and proving that the plaintiff has failed to exhaust administrative remedies."). However, when a plaintiff files an amended complaint, the new complaint supersedes all previous complaints and controls the case from that point forward. *See Carver v. Condie*, 169 F.3d 469, 472 (7th Cir.1999). Because a plaintiff's new complaint wipes away prior pleadings, the amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defenses. *See Harris v. Secretary, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 343 n. 2 (D.C.Cir.1997); *see also Sidari v. Orleans County*, 174 F.R.D. 275, 283 (W.D.N.Y.1996) (filing of an amended complaint gives defendants the opportunity to assert new affirmative defenses).

Here, defendants' Answers to Massey's Amended Complaint and Second Amended Complaint did not mention Massey's failure to exhaust his administrative remedies. Defendants did, however, raise Massey's failure to exhaust his administrative remedies in their Answers to his Third and Fourth Amended Complaints. According to Massey, this was not soon enough and by failing to assert the affirmative defense earlier, defendants waived their right to raise the exhaustion issue.

We disagree. By asserting failure to exhaust administrative remedies in their Answers to Massey's Third and Fourth Amended Complaints, defendants clearly complied with Rule 8(c). Defendants' actions also provided Massey with ample notice of their intent to use that affirmative defense. *See Blonder–Tongue Labs. v. Univ. of Illinois Found.*, 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and an opportunity to contest it). Accordingly, defendants' failure to raise exhaustion of administrative remedies in response to Massey's first few complaints did not constitute a waiver of that affirmative defense. To hold to the contrary would, in essence, enable plaintiffs to change their theory of the case while simultaneously locking defendants into their original pleading. This result would clearly contravene Federal Rule of Civil Procedure 15(a) which authorizes the amendment of answers "as justice so requires." We therefore reject Massey's argument.[5]

## II. Dr. Otten's Claims

Less than two months after being fired from his job, Dr. Otten joined Massey's lawsuit and asserted that defendants retaliated against him in violation of the

Massey ever mentioned this argument to the district court. We have repeatedly held that an argument not raised before the district court is waived on appeal. *See, e.g., Kyle v. Morton High Sch. Dist.* 201, 144 F.3d 448, 454 (7th Cir.1998); *Oates v. Discovery Zone*, 116 F.3d 1161, 1168 (7th Cir.1997).

**5.** In any event, even if defendants had not asserted exhaustion of administrative remedies in their Answers, they adequately preserved the affirmative defense by making the argument in their motion to dismiss. This court has specifically held that defendants do not waive an affirmative defense by failing to raise it in their answer so long as they assert the affirmative defense in a subsequent motion to dismiss. *Blaney v. United States*, 34 F.3d 509, 512 (7th Cir.1994).

First Amendment by terminating his employment at FCI Pekin because he openly opposed the medical treatment of certain prisoners.[6] In addition to his charge that prison officials violated his constitutional rights, Dr. Otten also levied two claims on behalf of inmates at FCI Pekin. Specifically, Dr. Otten said that the prison officials (1) deprived prisoners of their First Amendment right to have unimpeded access to the courts; and (2) administered medical treatment to FCI Pekin inmates that violated the Eighth Amendment. The district court dismissed Dr. Otten's First Amendment claim under *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) because the Civil Service Reform Act ("CSRA") provides Dr. Otten's exclusive remedy for an alleged constitutional violation arising out of his federal employment. *Massey v. Helman*, 35 F.Supp.2d 1110, 1115–16 (C.D.Ill.1999). As for the two claims that Dr. Otten brought on behalf of inmates at FCI Pekin, the district judge dismissed those on the basis that Dr. Otten had no standing to assert claims on behalf of prisoners. *Id.* at 1116–17.

## A. Dr. Otten's First Amendment Retaliation Claim

■ In his appeal, Dr. Otten argues that the district court should not have dismissed his First Amendment claim under *Bush v. Lucas*. In *Bush*, a federal employee brought a First Amendment retaliation claim against the National Aeronautics and Space Administration ("NASA"). *Bush*, 462 U.S. at 369, 103 S.Ct. 2404. In both administrative and federal court proceedings, Bush alleged that he had been demoted because he made public statements that were critical of his supervisors and of NASA policies. *Id.* at 369–70, 103 S.Ct. 2404. The Supreme Court concluded that Bush could not maintain his First Amendment *Bivens* claim against NASA because Congress had established an elaborate remedial scheme through which federal employees could seek redress for constitutional wrongs related to their federal employment. *Id.* at 388–90, 103 S.Ct. 2404. The Court reasoned that Congress is in a better position than courts to decide whether federal employees should have a *Bivens* cause of action when those federal workers have such an extensive administrative remedy available. *Id.* at 390, 103 S.Ct. 2404. The Court found that the comprehensive administrative remedy available to Bush constituted a "special factor" which required the Court to refrain from creating a judicially-fashioned *Bivens* remedy. *Id.* at 389–90, 103 S.Ct. 2404.

Our cases interpreting *Bush* make it abundantly clear that Dr. Otten has no *Bivens* remedy in federal court for the claimed retaliation. For example, in *Robbins v. Bentsen*, 41 F.3d 1195, 1202 (7th Cir.1994), we held that an employee of the Internal Revenue Service could not maintain a First Amendment retaliation claim because we were "clearly presented with a situation in which Congress has provided an elaborate remedial scheme, the CSRA, for the protection of … constitutional rights in the employment context." Similarly, in *Feit v. Ward*, 886 F.2d 848, 851–56 (7th Cir.1989) we expressly found that the CSRA's extensive remedial scheme precluded a First Amendment retaliation

---

6. Read liberally, the Fourth Amended Complaint also contains a claim by Dr. Otten that the prison officials violated his Eighth Amendment "right and duty" to provide adequate medical care to prisoners. *See Massey v. Helman*, 35 F.Supp.2d 1110, 1114 (C.D.Ill. 1999). Dr. Otten appears, however, to have abandoned this claim on appeal. (*See* Appellants' Brief at 34.) Nevertheless, even if Dr. Otten had not abandoned this claim, it clearly lacks merit because the Eighth Amendment only applies to individuals who are being punished for violating criminal statutes. *See Ingraham v. Wright*, 430 U.S. 651, 664–71, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998). The Eighth Amendment does not, as Dr. Otten suggests in his complaint, confer rights on employees who work in prisons.

claim by a former employee of the United States Forest Service. In *Moon v. Phillips*, 854 F.2d 147, 150 (7th Cir.1988), we observed that "subject to narrow exceptions, a federal employee cannot file a suit for damages against his supervisor for an unconstitutional adverse personnel action when Congress has provided an adequate administrative remedy." Citing the provisions of the CSRA, we held that a federal employee could not maintain a First Amendment retaliation claim. *Id.* at 152. Finally, in *Ellis v. United States Postal Service*, 784 F.2d 835, 839–40 (7th Cir. 1986), we affirmed the dismissal of "political discrimination" claims under *Bush* because postal employees have an extensive remedy under the collective bargaining agreement established by federal law.

Here, Dr. Otten was a federal employee who could have used the CSRA to complain about the alleged retaliation which he asserted violated his First Amendment rights. As we explained in great detail in *Feit*, the CSRA creates an elaborate remedial scheme through which federal employees can seek review of allegedly unconstitutional employment actions. *See Feit*, 886 F.2d 852. Where, as in this case, Congress has fashioned such a detailed and comprehensive administrative process for federal workers to lodge complaints, " '*Bush* does not permit us to apply a separate constitutional cause of action.' " *Robbins*, 41 F.3d at 1202 (quoting *Ellis*, 784 F.2d at 840). Dr. Otten fails to offer any principled reason for this court to hold that *Bush v. Lucas* does not doom his First Amendment claim; nor has Dr. Otten even attempted to distinguish the facts of his case from our precedent concluding that the CSRA constitutes his only remedy for the alleged retaliation.

Dr. Otten does, however, creatively attempt to resurrect his First Amendment claim by emphasizing that the district court dismissed the claim for lack of subject matter jurisdiction. According to Dr. Otten, if the viability of his First Amendment claim depends on whether the court

has subject matter jurisdiction, then we should reverse because the district court had supplemental jurisdiction over his claim under 28 U.S.C. § 1367(a). Dr. Otten's novel theory begins with the premise that the district court had subject matter jurisdiction over Massey's Eighth Amendment claim. Dr. Otten then points out that his First Amendment retaliation claim is related to Massey's Eighth Amendment claim because they are both based on the same allegedly unconstitutional medical policies. Dr. Otten concludes that the trial court had supplemental jurisdiction over his First Amendment claim because it forms part of the same case or controversy as Massey's Eighth Amendment claim over which the district court had original jurisdiction. *See* 28 U.S.C. § 1367(a).

■ There is a fundamental flaw in this theory. Although the district court dismissed Dr. Otten's retaliation claim for lack of subject matter jurisdiction, 35 F.Supp.2d at 1116, this was not the correct basis for the dismissal. Instead, the district judge should have dismissed the claim under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Federal courts do have jurisdiction to hear a First Amendment retaliation claim by a federal employee. The Supreme Court made this clear in *Bush* by stating:

> [t]he federal courts' power to grant relief not expressly authorized by Congress is firmly established. Under 28 U.S.C. § 1331, the federal courts have jurisdiction to decide all cases "aris[ing] under the Constitution, laws, or treaties of the United States." This jurisdictional grant provides not only the authority to decide whether a cause of action is stated by a plaintiff's claim that he has been injured by a violation of the Constitution, *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946), but also the authority to choose among available judicial remedies in order to vindicate constitutional rights.

*Bush*, 462 U.S. at 374, 103 S.Ct. 2404. It is clear that 28 U.S.C. § 1331 gives federal

courts jurisdiction to hear constitutional claims such as Dr. Otten's First Amendment claim.

After declaring that federal courts have jurisdiction over such claims, the Court explained that the extent to which courts should exercise this power must be tempered by policy considerations. *Id.* at 376, 103 S.Ct. 2404. The Court summarized the interplay between jurisdiction and the responsibility to refrain from creating new causes of action by stating:

> [t]he federal courts' statutory jurisdiction to decide federal questions confers adequate power to award damages to the victim of a constitutional violation. When Congress provides an alternative remedy, it may, of course, indicate its intent, by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself, that the Court's power should not be exercised. In the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation.

*Id.* at 378, 103 S.Ct. 2404. The Supreme Court's cases have unequivocally established the "power to grant relief that is not expressly authorized by statute, but they also remind us that such power is to be exercised in light of relevant policy determinations made by the Congress." *Id.* at 373, 103 S.Ct. 2404. Based on these competing principles, the Court concluded that Congress, not the judiciary, must decide whether " 'to create new substantive legal liability' " for federal employees who claim constitutional deprivations. *Bush,* 462 U.S. at 390, 103 S.Ct. 2404 (quoting *United States v. Standard Oil Co.,* 332 U.S. 301, 302, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947)).

*Bush* therefore teaches that the rule precluding constitutional claims by federal employees who have adequate administrative remedies stems from the absence of substantive legal rights rather than the courts' lack of subject matter jurisdiction. These substantive rights do not exist because Congress has not created such a cause of action and the Supreme Court has recognized that courts must defer to congressional judgment on the issue. Accordingly, the appropriate basis for dismissing a *Bivens* claim under *Bush v. Lucas* is failure to state a claim upon which relief can be granted, not lack of subject matter jurisdiction.[7]

In this case, the district court dismissed Dr. Otten's First Amendment claim for lack of subject matter jurisdiction. In doing so, the court applied analysis which shows that Dr. Otten's First Amendment claim should have been dismissed for failure to state a claim upon which relief can be granted. In these circumstances, "we have previously held that if remanding a case dismissed for want of subject matter jurisdiction would be futile because appellant has also failed to state a claim upon which relief can be granted, we will affirm the district court, even though the dismissal for lack of subject matter jurisdiction was improper." *Gammon v. GC Services Ltd. Partnership,* 27 F.3d 1254, 1256 (7th Cir.1994) (citing *Shockley v. Jones,* 823 F.2d 1068, 1073 (7th Cir.1987); *White v. Elrod,* 816 F.2d 1172, 1176 (7th Cir.1987)). Because the analysis employed by the district court shows that Dr. Otten's First Amendment claim was legally insufficient under Rule 12(b)(6), we affirm the dismissal of Dr. Otten's First Amendment claim.

## B. Dr. Otten's Claims on Behalf of FCI Pekin Inmates

In addition to his own First Amendment claim, Dr. Otten also brought two claims

---

**7.** This conclusion finds further support in our decisions based on *Bush. See. Robbins,* 41 F.3d at 1196; *Feit,* 886 F.2d at 850; *Moon,* 854 F.2d at 148; *Ellis,* 784 F.2d at 837 n. 2. In each of these cases, we affirmed a district court's dismissal of a federal employee's First Amendment retaliation claim for failure to state a claim upon which relief can be granted.

on behalf of inmates at FCI Pekin. Dr. Otten alleged that the prison officials (1) deprived prisoners of their First Amendment right to have unimpeded access to the courts when they fired him; and (2) administered medical treatment to FCI Pekin inmates that violated the Eighth Amendment. Finding that Dr. Otten had no standing to assert the constitutional rights of these prisoners, the district judge dismissed both of these claims.

■ "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). When considering whether a party satisfies the constitutional requirement of standing, the court must determine that "the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'" *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). In other words, to meet the constitutional element of standing, the plaintiff must allege an actual "case or controversy" within the meaning of Article III. *Warth*, 422 U.S. at 498, 95 S.Ct. 2197.

■ In addition to the constitutional limitation on standing, courts also impose "prudential limitations" on the class of persons who may invoke federal jurisdiction. *Id.* Among these prudential restrictions is the general rule that a litigant must assert his own legal rights and cannot assert the legal rights of a third party. *See United States v. Raines*, 362 U.S. 17, 22–23, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *Tileston v. Ullman*, 318 U.S. 44, 46, 63 S.Ct. 493, 87 L.Ed. 603 (1943); *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir.1996). "This rule flows from a concern that third parties will not adequately represent the individuals whose rights they seek to vindicate." *Retired Chicago Police*, 76 F.3d at 862. The Supreme Court has, however, recognized third party standing on "rare occasions" when the plaintiff can show a sufficiently significant personal interest in the outcome of the case to satisfy Article III's case or controversy requirement. *Indemnified Capital Investments, S.A. v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1409 (7th Cir.1993).

■ Thus, "[w]hen a person or entity seeks standing to advance the constitutional rights of others, we ask two questions." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n. 3, 109 S.Ct. 2646 (1989). First, has the litigant suffered some injury in fact sufficient to create a case or controversy in the Article III sense? And second, as a prudential matter, is the plaintiff the proper proponent of the particular legal rights he is asserting? *Id.*; *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (majority opinion). When a litigant attempts to assert the rights of a third party, "the standing question ... is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500, 95 S.Ct. 2197.

■ Here, Dr. Otten's third party claims allege that prison officials deprived inmates of their First Amendment right to have unimpeded access to the courts and administered medical treatment that violated the Eighth Amendment. We find that Dr. Otten has no standing to assert these claims because he does not satisfy the constitutional case or controversy requirement. Neither of these borrowed claims shows that Dr. Otten had a personal stake in the outcome of the prisoners' case. Rather, both claims pertain exclusively to the rights and interests of the inmates. Dr. Otten does not allege that his own constitutional rights or other interests correlated to or were affected by the prison-

ers' First and Eighth Amendment rights that he sought to assert.

Dr. Otten apparently seeks to establish that his rights were connected to the prisoners' First Amendment right of access to the courts because his termination hampered the prisoners' ability to obtain evidence in support of any claims they may assert. This contention does not survive close scrutiny because it directly contradicts allegations in the Fourth Amended Complaint. Specifically, the complaint alleges that Dr. Otten was suspended from his job just one day before he was scheduled to give a deposition in support of Massey's claim that FCI Pekin and BOP medical policies are unconstitutional. Nevertheless, even after his suspension, Dr. Otten continued with his deposition in Massey's case and gave extensive testimony in support of Massey's Eighth Amendment claim. Dr. Otten cannot seriously contend that his termination interfered with other prisoners' access to the courts by confining their ability to gather evidence in support of their cases.

Dr. Otten also fails to show that he has a stake of constitutional magnitude in the prisoners' Eighth Amendment rights. Dr. Otten has no Eighth Amendment interest in the medical treatment the prisoners receive; rather, the medical treatment afforded (or withheld) from prisoners is an issue in which only those individual prisoners have an actionable right. As the Supreme Court has held, when a party attempts to assert the rights of another not before the court, "the standing question ... is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500, 95 S.Ct. 2197. Here, the prisoners' rights are based in the Eighth Amendment—a constitutional provision that confers no rights on Dr. Otten. *See supra*, at note 6. Because Dr. Otten has no rights under the Eighth Amendment, he cannot possibly have a personal stake in the outcome of the Eighth Amendment claim he seeks to advance on behalf of the inmates.

Dr. Otten relies heavily on *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) in support of his argument that he has standing to assert the rights of his inmate-patients. *Singleton* involved physicians who "suffer[ed] concrete injury from the operation of the challenged statute." *Id.* at 112–13, 96 S.Ct. 2868 (majority opinion). The doctors in *Singleton* had a pecuniary interest in their patients' case because the statute at issue precluded the doctors from collecting payment for medical abortion services they provided for their patients. *Id.* at 113, 96 S.Ct. 2868. Thus, the Supreme Court observed that "if the physicians prevail in their suit to remove this limitation, they will benefit, for they will then receive payment for the abortions." *Id.* Under those circumstances, a majority of the Court found the parties' positions "classically adverse" and held that under those circumstances "there clearly exists between them a case or controversy in the constitutional sense." *Id.* In stark contrast, Dr. Otten has no pecuniary interest in the prisoners' medical treatment and stands to gain nothing by advocating the third party rights of inmates at FCI Pekin. Dr. Otten fails to allege the existence of a case or controversy between himself and defendants.

▄▄ The lack of an Article III case or controversy is not the only reason that Dr. Otten does not have standing to assert claims on behalf of the FCI prisoners; standing is also improper in this case because prudential considerations show that Dr. Otten is not a proper individual to represent the prisoners' interests. These prudential factors require federal courts to "hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation." *Singleton*, 428 U.S. at 113, 96 S.Ct. 2868 (plurality opinion). Thus, courts recognize a general rule against allowing a litigant to seek vindication of the rights of a third

party not before the court. *Id.* at 114, 96 S.Ct. 2868. When determining whether to fashion an exception to this general rule, courts consider two facts: (1) the relationship of the litigant to the person whose right he seeks to assert; and (2) the ability of the third party to assert his own right. *Singleton*, 428 U.S. at 114–116, 96 S.Ct. 2868 (plurality opinion).

Dr. Otten seeks to pursue the rights of his inmate-patients at FCI Pekin and emphasizes the doctor-patient relationship between himself and the individuals he seeks to represent. In support of his argument that he has standing to assert these third-party rights, Dr. Otten again relies on *Singleton*, where the Supreme Court recognized a physician's standing to assert the rights of a patient seeking abortion services. *See* Singleton, 428 U.S. at 118, 96 S.Ct. 2868 (plurality opinion). According to Dr. Otten, there is no difference between the physician-patient relationship in *Singleton* and the relationship between himself and the inmates at FCI Pekin whose rights he seeks to litigate. We disagree with Dr. Otten's argument that the Supreme Court painted with so broad a brush when the Court recognized the physicians' standing in *Singleton*.

At least two important facts distinguish Dr. Otten's alleged physician-patient relationship with the FCI Pekin inmates from the doctor-patient relationship at issue in *Singleton*. First and foremost, the doctors in *Singleton* enjoyed an ongoing physician-patient relationship with their patients at the time they filed suit. Dr. Otten, on the other hand, had been fired from his job as a staff physician at FCI Pekin six weeks before he filed suit. Therefore, unlike the physicians in *Singleton*, Dr. Otten did not have doctor-patient relationship with the prisoners when he brought the lawsuit and attempted to assert third party standing. Without the existence of this relationship, Dr. Otten does not establish the "closeness" between the litigant and the third party that existed in *Singleton* and that led the Supreme Court to recognize the doctors' standing. Since he was not the prisoners' physician when he filed suit, Dr. Otten is not a proper proponent of the prisoners' rights.

Another crucial difference between this case and the physician-patient relationship in *Singleton* is the nature of the medical treatment the patients sought to receive. In *Singleton*, the patients sought to obtain abortions—a time sensitive medical decision that involves a potential human life and one which many women do not make without first obtaining counseling from their physician. The unique nature of the abortion services at issue in *Singleton* prompted the Supreme Court to remark that "the constitutionally protected abortion decision is one in which the physician is intimately involved. Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision." *Singleton*, 428 U.S. at 117, 96 S.Ct. 2868 (plurality opinion). Unlike the physicians in *Singleton*, Dr. Otten is not seeking to provide time-sensitive medical services which involve a potential human life or that require intense counseling before deciding to administer. Rather, Dr. Otten focuses his claim on run-of-the-mill ailments for which he believes the prisoners should receive treatment. Dr. Otten fails to allege that the inmates at FCI Pekin are in need of medical treatment as unique as an abortion.

The second prudential consideration—the ability of the third party to assert his own rights—also counsels against recognizing Dr. Otten's request for standing. There is no allegation in the Fourth Amended Complaint which suggests that the inmates have any obstacle preventing them from properly asserting their own rights. Unlike *Singleton* where the Court found that the abortion patients' privacy considerations and imminent mootness of their claims interfered with their ability to pursue their own rights, Dr. Otten has

alleged no such facts.[8] The complaint in this case contains no hint that the prisoners' privacy could be unconstitutionally compromised if they brought their own lawsuits. Similarly, because Dr. Otten has not identified any specific prisoners with health problems that will become moot, he fails to illustrate that imminent mootness interferes with the prisoners' ability to advocate their own rights.

## CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.

8. Whether prisoners have any privacy rights in their prison medical records and treatment appears to be an open question. *See*

*Anderson v. Romero*, 72 F.3d 518, 522–23 (7th Cir.1995).