In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1354

ANTHONY McCOY,

Plaintiff-Appellant,

v.

JAMES R. GILBERT, FREDERICK H. APER,
DAVID POGGEMOELLER, HERMAN S. NELSON
and ROBERT ZACHARY,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 96-CV-790--David R. Herndon, Judge.

Argued SEPTEMBER 6, 2001--Decided October 30, 2001


   Before COFFEY, KANNE and EVANS, Circuit
Judges.

   COFFEY, Circuit Judge.  Anthony McCoy is
a federal inmate in Lisbon, Ohio, who was
formerly held at the Federal Correctional
Institution in Greenville, Ill.
("Greenville"). McCoy claims that he
suffered cruel and unusual punishment at
the hands of Greenville's correctional
officers, who allegedly beat him in late
October 1995 in retaliation for his
involvement in a prison riot that
occurred earlier in the month. The
district court found that McCoy had not
exhausted the administrative remedies
available to him at Greenville. The court
granted Defendant Zachary's motion for
summary judgment, granted Defendant
Nelson's motion to dismiss, and then
dismissed without prejudice the claims
against the remaining defendants sua
sponte. We affirm.

I.

   Greenville is an overcrowded, medium-
security federal prison where more than
1000 men are housed in four units that
have a capacity of 750. By October 1995,
tensions had been mounting at Greenville
for several weeks./1 The Bureau of
Prisons ("BOP") ordered a lockdown at all

federal institutions on October 20, 1995. Greenville's inmates are rarely confined in this manner, and many of them became agitated and suspicious of the guards because they refused to explain the reason for the lockdown. Scores of prisoners in two housing units erupted violently. The ensuing riot, which engulfed the unit where McCoy resided, lasted 24 hours and was of such magnitude that it made national news. Numerous employees sustained severe injuries, and the prison itself suffered more than $400,000 in property damage.

A group of vigilante correctional officers, including the appellees, amassed a list of prisoners who were believed to have been involved in the disturbance. On the night of October 26, 1995, the officers donned full riot gear and burst into McCoy's cell. Nelson sneered, "You like to hurt officers. You like to kill officers. You tried to set me on fire. You're not so tough by yourself. I got my gang now." McCoy told Nelson that he neither joined nor participated in the rioting and, upon review, we have not discovered any evidence that would disprove McCoy's statement. Nevertheless, according to McCoy, Nelson and the others handcuffed him, slammed his head against the cell door, and dragged him into another room used for strip searches. They cut his shirt off, slapped him across the face, and forced him to stand with his nose against the wall. While McCoy stood forlornly, the appellees repeatedly beat him in the rib area with riot sticks. After they completed their assaults, they returned McCoy to his cell, where they continued to verbally taunt him. A few minutes later, the appellees threw another inmate into McCoy's cell and left both men there, bare naked, for the rest of the night.

BOP and the U.S. Department of Justice investigated the prison riot, and Aper, Gilbert, Nelson, and Zachary were cited in April 1996 for such odious misconduct as: verbally and physically abusing inmates, neglecting official duties, advising staff to violate prison policy, failing to report abusive behavior, and filing false statements with the FBI. McCoy brought suit pro se on September 11, 1996. With the assistance of appointed counsel, he filed an Amended

Complaint on September 3, 1999, raising claims under the Fifth Amendment and Eighth Amendment.

The Prison Litigation Reform Act of 1995 provides that "[n]o action shall be brought with respect to prison conditions" under 42 U.S.C. sec. 1983 "or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. sec. 1997e(a). Greenville, like all federal prisons, has a multi-step administrative grievance system that allows for the hearing and review of prisoner complaints. Federal regulations require prisoners to try to resolve their complaints through informal discussions with the prison's staff. If such discussions are unproductive, then the prisoner has twenty days from the complained-of events to file a written Administrative Remedy Request with the warden, who is empowered to investigate the complaint and to grant or deny the prisoner's request for relief as he deems prudent. If the prisoner is not satisfied with the warden's response, then he may continue to seek relief by filing written appeals to BOP's regional director and then to  BOP's general counsel. See 28 C.F.R. sec.sec. 542.10 to .19. Only after completing these steps has a prisoner exhausted his administrative remedies.

McCoy failed to follow Greenville's procedures. His effort at exhaustion consisted only of complaining to the staff in his housing unit and cooperating with the Justice Department's subsequent investigation of the prison riot./2 Although allegations of assault and excessive force are subject to exhaustion, see Johnson v. Litscher, 260 F.3d 826, 828 (7th Cir. 2001); Smith v. Zachary, 255 F.3d 446, 449-50 (7th Cir. 2001), McCoy never filed a formal Administrative Remedy Request asking for money damages, nor did he appeal any decision with which he disagreed./3

Officers Zachary and Nelson both moved to dismiss. Nelson attacked the pleading on its face, while Zachary attached an affidavit from a Greenville administrator, who confirmed that McCoy never "filed any requests for administrative remedy during his incarceration with the Federal Bureau of

Prisons." The pleadings were referred to U.S. Magistrate Judge Philip M. Frazier, who considered the affidavit when ruling on Zachary's motion. After completing his review, Judge Frazier properly converted Zachary's motion to dismiss into one for summary judgment, Fed. R. Civ. P. 12(c), and, upon applying the correct standard of review to Zachary's motion for summary judgment and Nelson's motion to dismiss, recommended that they be granted. The district court adopted the recommendation and dismissed the entire complaint, finding that all of McCoy's claims against every defendant were subject to exhaustion. We review the rulings de novo. Massey v. Helman, 259 F.3d 641, 645 (7th Cir. 2001) (dismissal of prisoner's complaint); Patrick v. Jasper County, 901 F.2d 561, 564-65 (7th Cir. 1990) (summary judgment in sec. 1983 case).

II.

On appeal, McCoy argues that the district court erred in applying the PLRA's exhaustion requirements. McCoy was injured October 26, 1995, and the PLRA was signed into law April 26, 1996. Under Greenville's grievance resolution policy--which has been in effect since at least 1995--an inmate forfeits his right to sue unless he submits a formal, written complaint within twenty days of the alleged offense or demonstrates "a valid reason for the delay." 28 C.F.R. sec. 542.14(b). Although McCoy never did file such a complaint, he notes that the law that existed on the date of his assault did not mandate the exhaustion procedure. See, e.g., Neville v. True, 900 F. Supp. 972, 979 (N.D. Ill. 1995). Furthermore, McCoy claims that BOP's twenty-day period for filing formal complaints expired on November 15, 1995, which was long before the PLRA took effect. Thus, his contention is that it was impossible for him to have exhausted his remedies at the time when he brought suit. We reject this argument, because from our review of the record, we are of the opinion that McCoy has always had the opportunity to exhaust, but he simply chose not to.

A.

"When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed

the statute's proper reach." Lansgraf v. USI Film Prods., 511 U.S. 244, 280 (1994). If the statute does not clearly identify the prior events that may be subject to regulation, then we must consider whether the application of the statute to the conduct at issue would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id.

Of course, almost every new statute results in some perceptible effect or impact on countless past or pre-existing choices, decisions, and interests of the actors and subjects in the newly-regulated field. For example, the Court has held that the PLRA's attorney fee limitations, see 42 U.S.C. sec. 1997e(d)(3), apply to any postjudgment monitoring performed after the PLRA took effect, even if the underlying case was filed before then. See Martin v. Hadix, 527 U.S. 343 (1999). The Court concluded that the statute, "as applied to work performed after the effective date of the PLRA . . . has future effect on future work; this does not raise retroactivity concerns." Id. at 360. Yet it is apparent that such a statutory construction nevertheless disappoints certain expectations developed by the attorneys who agreed to begin working on the cases before 1996 even if the statute is applied only to work performed after 1996. See id. at 362-63 (Scalia, J., concurring in judgment). When the attorneys decided to file their ambitious institutional reform cases in the late 1970s, they presumably had calculated their potential compensation in reliance on the then-existing legal regime, which did not cap recovery at less-than-market rates. By applying the PLRA's new fee caps to prospective work on existing cases, the Court limited the attorneys' future income stream, effectively reduced the value of the attorneys' prior investment in the litigation, and frustrated certain aspects of the fee-sharing relationship into which the parties had entered. See id. at 369-70 (Ginsburg, J., concurring and dissenting in part).

What Martin states is that we cannot simply ask whether application of the PLRA would have some imaginable

retroactive effect on the choices McCoy made before April 26, 1996. Rather, we must scrutinize "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event," Lansgraf, 511 U.S. at 270, i.e., the exhaustion requirement and McCoy's decision not to file a grievance before bringing suit, and ask whether application of the requirement would comport with "familiar considerations of fair notice, reasonable reliance, and settled expectations" of the parties at the time of their conduct. Id. If the statute's enforcement would unduly conflict with these important societal values, then it will not be applied in cases like McCoy's absent a "clear indication from Congress that it intended such a result." INS v. St. Cyr, 121 S.Ct. 2271, 2288 (2001).

B.

Congress never has stated that the PLRA's exhaustion requirements should be applied retroactively. As a result, courts have permitted non-exhausted lawsuits to proceed if they were filed before April 26, 1996. See, e.g., Mitchell v. Shomig, 969 F. Supp. 487 (N.D. Ill. 1997). Yet Mitchell is inapposite, for McCoy filed suit after the PLRA's enactment, not before. One of the PLRA's primary purposes is to "enable prison officials to resolve complaints internally and to limit judicial intervention in the management of state and federal prisons." Smith, 255 F.3d at 449. The statute embodies a firm congressional will that keeps with a bedrock principle of our jurisprudence: "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Thomas v. Ramos, 130 F.3d 754, 759 (7th Cir. 1997) (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)). While some prisoner cases have merit--and McCoy's does appear to have some merit-- an inordinate number do little more than drain precious time and resources from an overburdened judicial system. Thus, we examine the scope of the exhaustion requirement, for the administrative process will allow prisoners to articulate specific grievances and pursue

reliefoutside of the adversarial confines of a judicial forum. Ideally, the process will facilitate negotiation and reduce the scope of future litigation if any of the inmate's grievances are not internally resolved. Smith, 255 F.3d at 451 (citing Perez v. Wisconsin Dep't of Corr., 182 F.3d 532, 535 (7th Cir. 1999)).

The text of 42 U.S.C. sec. 1997e(a) states that "[n]o action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted." The exhaustion requirement applies whenever there is some administrative process remaining at the prisoner's disposal. See Johnson, 260 F.3d at 829; Massey v. Helman, 196 F.3d 727, 734 (7th Cir. 1999). The statute plainly served McCoy with notice that he could not enter federal court after April 26, 1996 until such time as he had exhausted the prison's grievance process./4 McCoy has attempted to make an end run around the statute by choosing to sue first, then to expand upon his complaint with an amendment three years later. This is precisely the type of litigious behavior the PLRA was designed to prevent. McCoy argues, however, that the statute cannot apply to him, claiming that Greenville's administrative remedies were no longer "available" for exhaustion, because BOP's regulations afforded him only twenty days after he was beaten to file a grievance. McCoy's argument rests on the premise that BOP's twenty-day window of opportunity permanently closed in mid-November 1995. This premise is faulty; thus, we reject this argument.

McCoy overlooks the crucial fact that, although an inmate must normally submit a formal grievance within twenty days of the complained-of events, there is a hardship exception for inmates who are able to demonstrate a valid reason for not meeting the deadline. The pertinent regulations read as follows:

Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-

transit during which the inmate was
separated from documents needed to
prepare the Request or Appeal; an
extended period of time during which the
inmate was physically incapable of
preparing a Request or Appeal; an
unusually long period taken for informal
resolution attempts; indication by an
inmate, verified by staff, that a
response to the inmate's request for
copies ofdispositions requested under
sec. 542.19 of this part was delayed.
28 C.F.R. sec. 542.14(b).

McCoy speculates that Greenville would
not have excused his failure to file
before November 15, 1995. However, the
record is devoid of any evidence to
substantiate McCoy's assertion, and we
cannot imagine why the institution would
have construed the regulations in this
fashion. The regulations plainly grant
Greenville the discretion to excuse
untimely grievances if serious
aggravating factors or forces
substantially influence a reasonable
prisoner's ability or incentive to
comply. On the one hand, the prisoner's
grievance will be permanently waived, and
the exception will not be available in
the ordinary case of strategic delay,
negligence, ignorance or mistake. But on
the other hand, in this case, the
amendment to sec. 1997e(a) was not
reasonably foreseeable, and it made a
world of difference with respect to
McCoy's incentive to grieve. Our concern
is not with whether Greenville would have
accepted or rejected the post-PLRA
grievance. Instead, we "merely need to
ask whether the institution has an
internal administrative grievance
procedure by which prisoners can lodge
complaints about prison conditions."
Massey, 196 F.3d at 734. Greenville had
the authority to take some sort of action
with respect to a tardy complaint.
Therefore, we hold that McCoy must
initially have made an attempt to use
Greenville's administrative process. See
Perez, 182 F.3d at 536 ("[n]o one can
know whether administrative requests will
be futile; the only way to find out is to
try.")

We have recognized that a procedural
change in the law should rarely be
allowed to extinguish substantive rights
absent an express declaration from the
legislature. This is known as the

"mousetrapping principle." See Burris v. Parke, 95 F.3d 465, 469 (7th Cir. 1995) (en banc). In this case, however, we are not using a new law to penalize McCoy's prior actions. We are merely holding McCoy to the same requirements as any other prisoner who filed suit after the enactment of the PLRA on April 26, 1996.

On appeal, McCoy sought to align his case with Burris. Burris was convicted and given the death penalty at a time when the law permitted multiple successive habeas petitions. He filed his first petition in December 1991, and he elected to challenge only his conviction. Then in November 1995, he filed a second petition and challenged only his sentence. The AEDPA took effect in April 1996, and it barred second or successive habeas petitions except in limited factual situations that were not present in Burris's case. See id. at 466-67. We held, however, that the application of AEDPA to the second petition would have attached a serious, material, and tangible new legal consequence to the first challenge that did not exist when the challenge occurred. Put another way, we refused to apply AEDPA's new rule because Burris had no way of foreseeing in 1991 or 1995 that he would be unable to challenge his conviction in one petition and his death sentence in another. If he had, we are convinced, then he would have brought the challenges simultaneously, which is what condemned prisoners customarily do. See id. at 468-69. In so holding, we expressly distinguished Felker v. Turpin, 52 F.3d 907 (11th Cir. 1995), aff'd, 518 U.S. 651 (1996), where the courts applied AEDPA's "one petition rule" to a successive petition that was filed after AEDPA was passed. Because Felker raised a prior challenge to his conviction and his sentence, 52 F.3d at 909, we reasoned that there was no unfairness in applying the new law to Felker's second petition.

Burris and Felker teach that a procedural rule that governs the filing of cases can normally be applied to cases brought after the rule is enacted. "Application of a new jurisdictional rule usually takes away no substantive right but simply changes the tribunal that is to hear the case." Lansgraf, 511 U.S. at 274. This is not an unusual situation where, for example, McCoy attempted to

file a grievance and was rebuffed by Greenville on the grounds that he waited more than twenty days. If this had occurred, then McCoy would have been mousetrapped, because he could not have foreseen that his prior failure to grieve would deprive him of legal relief forever. See Mitchell, 969 F. Supp. at 492 (declining to apply exhaustion requirement when time for appealing state official's decision irrevocably expired before PLRA's passage); see also Miller v. Tanner, 196 F.3d 1190, 1194 (11th Cir. 1999) (discussing exhaustion requirement's "futility" exception).

McCoy had notice of the new rule, and his reliance interests have not been unduly trammeled. We see no manifest injustice in telling a prisoner on a going-forward basis that he must work through and exhaust the administrative processes available to him, even if such exhaustion was optional under prior law. Congress has merely regulated future conduct without adjudicating the past. Indeed, courts in three other circuits have all dismissed non-exhausted complaints that were filed after April 26, 1996, notwithstanding that the underlying causes of action accrued prior to that date. See White v. McGinnis, 131 F.3d 593, 595 (10th Cir. 1997); Garrett v. Hawk, 127 F.3d 1263, 1266 (6th Cir. 1997); Polite v. Barbarin, 1998 U.S. Dist. LEXIS 3600, 1998 WL 146687 at *3 n.7 (S.D.N.Y. 1998); see also Foulk v. Charrier, 262 F.3d 687, 696 (8th Cir. 2001) (noting that exhaustion requirement applies to amended complaints filed after PLRA's passage unless complaint relates back to earlier filing).

In the event that the complained-of events transpired before the enactment of the PLRA, a prisoner can show exhaustion by demonstrating that he substantially complied with the institution's grievance policy. The prisoner must have clearly given the institution notice of his particular demands and reasonably triggered an attempt to resolve them. See Smith, 255 F.3d at 452; Wolff v. Moore, 199 F.3d 324, 328 (6th Cir. 1999). In this case, McCoy spoke informally with the prison guards in his unit, requested medical attention, and cooperated with the Justice Department's investigation of the prison riot by recounting the events over which he had personal knowledge.

Greenville's medics treated McCoy for his injuries, and the guards forwarded McCoy's concerns to the warden. The Justice Department's investigation was launched independently of McCoy's casual discussions, and it was calculated to effectuate reform on an institutional level, not to identify and respond to the particular grievances harbored by individual inmates. Greenville may have known that McCoy was angered about the guards' conduct, but McCoy failed to properly and adequately notify the prison that he sought monetary damages and intended to file suit. Therefore, the institution cannot be faulted for failing to address McCoy's grievance to his satisfaction.

We are aware of two decisions excusing a prisoner's failure to exhaust when the initial time period for bringing a formal complaint expired before April 26, 1996. See Lavista v. Beeler, 195 F.3d 254, 258 (6th Cir. 1999); Hitchcock v. Nelson, 1997 U.S. Dist. LEXIS 11487, 1997 WL 433668 at *2 (N.D. Ill. 1997). Lavista involved a federal prisoner who, like McCoy, had twenty days to file an Administrative Remedy Request, and Hitchcock involved an Illinois state prisoner who had six months to do the same. Although there was no evidence that the prisoners in either case attempted to invoke the hardship exception for untimely filings,/5 the courts appear to have assumed that the grievances would have been rejected. See Hitchcock, supra at *2 ("[t]o apply the exhaustion requirement here would 'mousetrap' Plaintiff and effectively extinguish his claim.") For the reasons previously stated, we disapprove of Hitchcock and Lavista. "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." Booth v. Churner, 121 S.Ct. 1819, 1825 (2001). Courts may not ignore the valid dictates of Congress and may not read exceptions into unambiguous legislation.

The judgment of the district court is AFFIRMED.

FOOTNOTES

/1 A report by the Bureau of Prisons subsequently attributed these anxieties to the prison's work assignments as well as the decision of the U.S.

Congress not to reform the sentencing guidelines for persons convicted of selling crack and powdered cocaine. See Appellees' Supp. App. Tab 1 ("After-Action Team Report of April 10, 1996").

/2 McCoy's Amended Complaint alleged as follows:

Plaintiff exhausted his administrative remedies pursuant to 42 U.S.C. sec. 1997(e)(a). Plaintiff made a complaint to officials at FCI Greenville on or about October 30, 1995. That complaint was eventually reported to defendant Rupert and was later referred by Warden Seiter to Internal Affairs for investigation. The complaint was then investigated by the Bureau of Prisons and the FBI. As a result of plaintiff's administrative complaint, and the subsequent investigation, defendant Nelson was disciplined, but plaintiff was not granted any relief.

/3 Contrary to our holdings in Johnson and Smith, the Second Circuit has concluded that excessive force claims are not subject to exhaustion. See Nussle v. Willette, 224 F.3d 95 (2d Cir. 2000), cert. granted sub nom. Porter v. Nussle, 121 S.Ct. 2213 (2001). On appeal, McCoy has waived any reliance on Nussle and has raised only his retroactivity arguments.

/4 The appellees offer stray quotations from several legislators to support their arguments concerning mandatory exhaustion. We need never consider legislative history when interpreting an unambiguous statute. United States v. Hudspeth, 42 F.3d 1015, 1022 (7th Cir. 1994) (en banc). Furthermore, we note that the legislative history offers particularly little insight in this instance. The PLRA was a substantive rider to an omnibus appropriations bill. Its provisions were never seriously debated, were never the subject of a Senate Judiciary Committee mark-up, and were never explained in any committee report. See Geoffrey C. Rapp, Note, Low Riding, 110 Yale L.J. 1089, 1092-93 (2001). Cf. Mills v. United States, 713 F.2d 1249, 1251-54 (7th Cir. 1983) (considering legislative history when bill was subjected to serious floor debate and committee analysis).

/5 See 28 C.F.R. sec. 542.14(b) (federal prisons); 20 Ill. Admin. Code sec. 504.810(a) (Illinois prisons).