Linda **FREILICH, M.D. and Linda Freilich, M.D., P.A., Plaintiffs,**

v.

**THE BOARD OF DIRECTORS OF UPPER CHESAPEAKE HEALTH, INC., formerly Harford Mem. Hospital, et. al. Defendants**

No. CIV.A. S00–3605.

United States District Court, D. Maryland.

May 14, 2001.

Jennifer Mary Valinski, Law Office of Paul S. Blumenthal, Annapolis, MD, Paul S. Blementhal, Annapolis, MD, for Linda Freilich, M.D., P.A., plaintiffs.

Ward B Coe, III, Whiteford Taylor and Preston, Baltimore, MD, Brian M Peters, Jonathan B Sprague, Mitchell Allen Cohen, Post and Schell PC, Philadelphia, PA, for Upper Chesapeake Health, Inc., Board of Directors of Upper Chesapeake Health, Inc., Cecilio T. Camacho, M.D. Joan P. Edwards, Scott S. haswell, M.D., Shirley S. klein, James Lambdin, Anthony J. Meoli, Lyle E. Sheldon, Kenneth W. DeFontes, jr., David F. Gonano, Sherif H. Osman, M.D., Roger E. Schneider, M.D., Diane K. Ford, H. William Acker, Randall Worthington, SR., defendants.

Wendy A Kronmiller, J Joseph Curran, Jr., Office of the Attorney General, Baltimore, MD, for Secretary, Maryland Department of Health and Mental Hygiene, defendant.

### *MEMORANDUM OPINION*

SMALKIN, District Judge.

The plaintiff, Dr. Linda Freilich, filed a 14–count, 76–page Complaint, against Upper Chesapeake Health (UCH), formerly Harford Memorial Hospital (HMH), fourteen individuals who were involved in her peer review, the State of Maryland, and the United States of America, alleging constitutional, statutory, and common law claims in connection with the hospital's termination of her medical staff privileges. Specifically, she alleges that the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11101 *et seq.*, which provides immunity from damages to those who participate in physician peer review, and the Maryland statute (Section 19–319(e) of the Health–General Article of the Maryland Code) and regulation (Section 10.07.01.24(E) of the Code of Maryland Regulations), which govern physician credentialing, are all unconstitutional. She also brings a § 1983 claim against the hospital and individual defendants claiming that these parties violated her constitutional rights in making the decision to terminate her staff privileges. Finally, she alleges violations of the Americans with Disabilities Act and the Federal Rehabilitation Act based on her association and care of dialysis patients at the hospital, and a host of state law claims related to her loss of staff privileges. The State of Maryland and the United States government have moved to dismiss all claims that the plaintiff has asserted against them, and the hospital defendants have filed motions to dismiss all of the federal claims

and several of the state law claims.[1] There is no complete diversity of citizenship, so this Court's original jurisdiction is invoked only under 28 U.S.C. § 1331.

The Court notes at the outset that, on top of filing an unbelievably lengthy and complex complaint in this case, the plaintiff's briefs have improperly strayed far off point, injecting arguments and additional claims that are themselves legally insufficient. The Court will disregard all of these matters, confining its analysis to what was asserted in the plaintiff's complaint. For the following reasons, all of the defendants' motions to dismiss will be GRANTED, as to all federal claims, and the Court will exercise its discretion to dismiss the remaining state law claims without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

*BACKGROUND*

Dr. Linda Freilich is a Board Certified Internist and Nephrologist who has practiced in Harford County, Maryland, and has had medical privileges at HMH for the past eighteen years.[2] On April 11, 2000, the hospital defendants, Harford Memorial Hospital (HMH), now operating as part of Upper Chesapeake Health, Inc. (UCH),[3] and a group of Dr. Freilich's peers at the hospital, denied Dr. Freilich's application for reappointment at the hospital. Dr. Freilich alleges that the defendants' failure to reappoint her was based on her "protected patient advocacy." Compl. at ¶ 21. Specifically, Dr. Freilich alleges that she advocated on behalf of certain patients at the hospital by making complaints about what she believed to be substandard care

provided to certain groups of patients, including nursing home, dialysis, and indigent patients. She alleges that as a result of this advocacy, HMH and its Board of Directors participated in "a predetermined and a deliberate scheme and systematic program designed to force her out of [the hospital] in violation of [her] Constitutional Rights and in violation of Maryland's Health Code, COMAR Regulations and Maryland Law and Public Policy." Compl. at ¶ 81.

Dr. Freilich applied for reappointment at HMH in July 1998, pursuant to HMH bylaws and the Maryland state regulations, COMAR, 10.07.01.24(E)(2), which require that medical staff members apply for reappointment at least every two years. Dr. Freilich's application was forwarded to the Credentials Committee, which recommended in October 1998 that she be reappointed for one year through November 1999. This decision was approved by the Medical Executive Committee ("MEC"). However, in December 1998, the Board of HMH did not accept the MEC's recommendation for a one-year appointment, deciding instead to extend Dr. Freilich's privileges until the next board meeting scheduled for April 1999, for the purpose of allowing the MEC to conduct further review of Dr. Freilich's application. On April 14, 1999, after further review, the MEC recommended that Dr. Freilich's reappointment application be denied. Because of this adverse recommendation, Dr. Freilich requested, and received, a hearing before the Ad Hoc Hearing Committee. In January 2000, the Hearing Committee recommended that Dr. Freilich be reap-

**1.** The hospital defendants filed, at the direction of this Court, a supplemental motion to dismiss the retaliation claims under the ADA and the FRA, and the associational discrimination claim under the ADA.

**2.** Linda Freilich, M.D., P.A., a Maryland professional association owned and operated by Dr. Freilich, is also a plaintiff in this action.

**3.** The hospital will be referred to as HMH throughout this opinion.

pointed retroactively for one year. The MEC requested appellate review of the Hearing Committee's recommendation, and at the Board's April 2000 meeting, the Appellate Review Committee proposed that Dr. Freilich's reappointment be denied. On April 11, 2000, the HMH Board voted to deny Dr. Freilich's application for reappointment to the medical staff, and to terminate her medical privileges. The basis for the Board's decision, as set forth in a letter notifying Dr. Freilich of the decision, was Dr. Freilich's "fail[ure] to demonstrate ethics and behavior in the hospital, cooperation with hospital personnel as it relates to patient care and the orderly operation of the hospital and proper general demeanor and attitude with respect to the hospital, its patients and its personnel." Compl., Ex. 2. The Board acted pursuant to a Medical Staff Bylaw which requires the Board to base its appointment recommendation upon certain criteria, including "[e]thics and behavior in the Hospital, cooperation with Hospital personnel as it relates to patient care or the orderly operation of the Hospital, and general demeanor and attitude with respect to the Hospital, its patients and its personnel." Bylaws, Appendix II § 3.1(g); Compl., Ex. 3. The Code of Maryland Regulations provides a standard for physician reappointment, which requires a hospital to collect and review certain information regarding the "physician's pattern of performance" including, among other factors, "[a]ttitudes, cooperation, and ability to work with others." COMAR § 10.07.01.24(E)(3)(b)(vii).

## STANDARD FOR MOTION TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss under 12(b)(6), a court must accept the allegations contained in the complaint as true. *See DeBauche v. Trani,* 191 F.3d 499, 505 (4th Cir.1999). The court is not, however, "bound by the plaintiff's legal conclusions, since the purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint." *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994). Because it appears beyond doubt that Dr. Freilich can prove no set of facts sufficient to support any of her federal claims, the Court will grant defendants' motions to dismiss them all.

## ANALYSIS

### I. The Constitutionality of Md. Ann. Code, Health–General § 19–319(e) and Code of Maryland Regulations § 10.07.01.24(E)

Dr. Freilich alleges in Count I that Md. Ann.Code, Health–General § 19–319(e) and Section 10.07.01.24(E)(3)(b)(vii) of the Code of Maryland Regulations are unconstitutional on their face and as applied to her.[4] The HMH bylaw cited as the basis for the denial of Dr. Freilich's reappoint-

4. While Dr. Freilich challenges the constitutionality of both the statute and the regulation, the specific provision she discusses in her Complaint is found only in the regulation. The statute requires hospitals to establish a credentialing process for physicians and directs that regulations be promulgated to establish standards for that process. The regulation outlines the factors to be considered when hospitals undertake such review. The statute is quite obviously constitutional. Therefore, the Court will consider the constitutionality of the regulation only, as it presents the requirement that Dr. Freilich maintains is unconstitutional.

ment incorporates Section 10.07.01.24(E)(3)(b)(vii), which requires hospitals to consider "[a]tttitude, cooperation and ability to work with others" when making credentialing decisions. Dr. Freilich alleges that this regulation is unconstitutionally vague, and that, as applied to her through the hospital's bylaws, it violates her free speech and due process rights. She argues that these criteria are vague, ambiguous, and subjective, and are unrelated to patient care. She also alleges that the regulation violates her right to equal protection, arguing that such vague criteria are incapable of uniform application. Specifically, she states that "the State of Maryland authorizes, mandates, directs, encourages and facilitates hospitals to utilize prejudice, interpersonal animosities, arbitrary and capricious actions, and discriminatory conduct as the basis for reappointment decisions ...." Compl. at ¶ 106.

### A. Constitutional Claims Against HMH and the Private Hospital Defendants

■ In this case, Dr. Freilich brings both an action challenging the constitutionality of the state regulation under the Fourteenth Amendment (Count I) and a Section 1983 action (Count IV), based on the alleged unconstitutionality of the decision to terminate her hospital privileges. In this context, the state action requirement for Fourteenth Amendment violations and the under-color-of state-law requirement of Section 1983 "converge." See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 n. 8, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Both requirements "exclude[ ] from [their] reach 'merely private conduct, no matter how discriminatory or wrongful.'" Id. at 50, 119 S.Ct. 977 (quoting Blum v. Yaretsky, 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (internal citation omitted)). Therefore, be-

cause HMH is a private entity, Section 1983 and the Fourteenth Amendment do not apply to its actions unless Dr. Freilich can satisfy the requirements for characterizing private persons' actions as state action. See Cogan v. Harford Mem. Hosp., 843 F.Supp. 1013, 1020 (D.Md.1994); Levin v. Sinai Hosp. of Baltimore City, 186 Md. 174, 178, 46 A.2d 298 (1946).

■ The Supreme Court has made clear that "state action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" American Mfrs., 526 U.S. at 50, 119 S.Ct. 977 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). In American Manufacturers, the Court explained that while private insurers may act pursuant to a state workers' compensation statute such that they satisfy the first prong of this test, they must still satisfy the second prong, even if the case involves a direct or facial challenge to the statute. See id. In considering the second prong of the state action analysis, the Court in American Manufacturers determined that the Pennsylvania statute at issue "authorizes, but does not require, insurers to withhold payments for disputed medical treatment." See American Mfrs., 526 U.S. at 52, 119 S.Ct. 977. Therefore, the Court found that the actions of private insurers were not fairly attributable to the state. See id. at 58, 119 S.Ct. 977.

■ In this case, the regulation does require hospitals to establish a formal reappointment process and to collect and review information on "[a]ttitudes, cooperation, and ability to work with others,"

among other things. COMAR § 10.07.01.24(E)(3)(b)(vii). However, the regulation does *not* require hospitals to deny reappointment to physicians, and the state plays no role in the individual hospital's decision whether or not to reappoint a particular physician. The regulatory scheme "leaves the challenged decisions" to the judgment of each individual hospital and, therefore, the actions of HMH and the individual hospital defendants are not fairly attributable to the state. *See id.* at 57–58, 119 S.Ct. 977 (citing *Blum*, 457 U.S. at 1011, 102 S.Ct. 2777 (finding decision of private nursing facilities not to constitute state action despite extensive state regulation) and *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357–58, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (finding decision of private utility was not state action despite heavy state regulation)).

In *Modaber v. Culpeper Mem. Hosp.*, 674 F.2d 1023 (4th Cir.1982), the Fourth Circuit affirmed the district court's dismissal of a physician's claim that his medical privileges were improperly revoked by a private hospital in violation of his constitutional rights, concluding that the private hospital's decisions did not constitute state action under § 1983. *See id.* at 1027. The court determined that the hospital's receipt of federal funds, its acceptance of patients receiving medicare benefits, and the fact that a state statute required the hospital to abide by certain reporting requirements, did not combine to make the hospital's actions attributable to the state. *See id.* Specifically, the court determined that the state reporting statute (which also provided immunity to those reporting the information) did not "authorize state officials to make privileges decisions, or to set forth directions governing the outcome of such decisions, or attach consequences to their results." *Id.* Like the statute in *Modaber*, the Maryland regulations do not authorize state officials to make privileges

decisions, direct the outcome of such decisions, or penalize hospitals for their credentialing or reappointment decisions. While plaintiff notes that the Maryland regulations governing the credentialing process provide for penalties, these penalties apply if the hospital fails to have a credentialing process in place that complies with the regulation, and have nothing to do with the individual decisions made by hospitals regarding physician credentialing. *See also Blum v. Yaretsky*, 457 U.S. at 1010, 102 S.Ct. 2777 (finding that a state regulation imposing penalties on private nursing homes did not create responsibility on the part of the state for private decisions to discharge or transfer patients). Moreover, the fact that a state regulation sets up a mechanism to guide the credentialing decision does not constitute state action.

In another case with facts strikingly similar to those at the issue in this case, the Ninth Circuit, in *Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024 (9th Cir.1989), *aff'd* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), considered a doctor's challenge to the constitutionality of a California statute and the HCQIA, arguing that the peer-review process governing the termination of his staffing privileges deprived him of due process under the Fourteenth Amendment. As the Supreme Court determined in *American Mfrs.*, the court concluded that while the first prong of the state action test was met because the hospital was required by state law to abide by the credentialing process, the second prong was not met, because "[o]nly private actors were responsible for the decision to remove [the plaintiff]." *Pinhas*, 894 F.2d at 1033–34. Finding that the state neither exercised "coercive power" nor provided "significant encouragement" to the hospital, the court held that the hospital's decision to remove the plain-

tiff's staff privileges did not constitute state action. *Id.* at 1034 (quoting *Blum*, 457 U.S. 991, 1004, 102 S.Ct. 2777). Similarly, only purely private actors at HMH were responsible for the decision to terminate Dr. Freilich's medical privileges. Therefore, Dr. Freilich's constitutional claims, both her facial challenge to the state regulation and the § 1983 action, must be dismissed as against HMH and the private hospital defendants.

## B. Constitutional Claim Against the State

Dr. Freilich has made it clear that she is not asserting a § 1983 claim against the State of Maryland. *See* Pl.'s Opp'n to State's Motion to Dismiss at 29. Therefore, her only claim against the State involves whether the Maryland state statute and regulation which govern the credentialing process are constitutional. Because the State played no role in the decision to terminate Dr. Freilich's medical staff privileges, it is only necessary for this Court to consider the facial challenge to the constitutionality of Maryland's regulation—that

is—whether the regulation itself violates due process or equal protection.[5]

### 1. Due Process

■ Dr. Freilich alleges that Maryland's regulation which requires hospitals to consider "attitude, cooperation and ability to work with others" as one of several factors in making physician reappointment decisions is so vague, ambiguous, and unrelated to patient care that it violates her due process rights. A majority of state and federal courts, have, however, consistently upheld state regulations and hospital bylaws that provide hospitals with the ability to make credentialing and reappointment decisions based on such criteria. Because the regulation does not impinge any fundamental right, it will be reviewed under a rational basis standard. *See Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir.1999) (citing *Washington v. Glucksberg*, 521 U.S. 702, 728, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). While Dr. Freilich suggests that the regulation impinges upon her fundamental right to free speech, this Court can conceive of no basis upon which

5. While recent case law suggests that a state is a "state actor" by virtue of its enactment of a statute, *see American Mfrs.*, 526 U.S. at 51, 119 S.Ct. 977 (citing the Third Circuit's opinion below, *Sullivan v. Barnett*, 139 F.3d 158, 167 (3rd Cir.1998), in which that court suggested that the state that enacted the statute that allegedly deprived the plaintiffs of their rights would certainly be a state actor), this assumption is slightly contrary to the Supreme Court's decision in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), in which the Court found that the state could not be held accountable for a decision made by purely private parties.

In *Blum*, the plaintiff sued the state in an attempt to hold the state responsible for the decisions of private nursing facilities regarding patient care. The case was different from most state action cases in which a private party is the defendant, and the plaintiff challenges the behavior of the private party suggesting it is state action. Here, Dr. Freilich

has sued both the state and the private hospital. The "principle is the same" in either procedural context. *See Carter v. Norfolk Cmty. Hosp. Ass'n, Inc.*, 761 F.2d 970, 972 (4th Cir.1985) (finding that a hospital's termination of medical privileges did not involve state action and finding that the plaintiff failed to state a claim upon which relief may be granted under § 1983.).

The *Blum* Court's decision suggests that the state of Maryland should not be held responsible for a private hospital's decisions. In fact, the *Blum* court considered and rejected the argument that certain state statutes and regulations converted the hospital's private decision into one for which the state was responsible. *See id.* at 1005–1010, 102 S.Ct. 2777. In light of this precedent, and the fact that Maryland played no role in the decision to terminate Dr. Freilich's privileges, the Court will consider only the facial challenge to Maryland's regulation.

Dr. Freilich makes this assertion. The regulation itself does not place any restrictions whatever on speech, and while Dr. Freilich may argue that the hospital's application of the regulation to her resulted in her privileges being terminated for speaking out about patient care, the private hospital's conduct is not attributable to the state for purposes of establishing a First Amendment violation. Furthermore, the regulation will withstand a vagueness challenge if it merely provides physicians with reasonable notice as to the type of conduct that may cause a denial of their hospital privileges. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

In Maryland, private hospitals have historically had wide discretion in making decisions affecting medical staff privileges at their facilities. *See Levin v. Sinai Hosp. of Baltimore City*, 186 Md. 174, 179–80, 46 A.2d 298 (1946) ("We hold that a private hospital has the right to exclude any physician from practicing therein, and such exclusion rests within the sound discretion of the managing authorities."); *see also Glass v. Doctors Hospital, Inc.*, 213 Md. 44, 63, 131 A.2d 254 (1957) (finding that hospital's failure to renew doctor's staff privileges was not arbitrary because the "record [was] replete with evidence that [the doctor] was an obstacle to the control of the hospital by the board, that he was not amenable to discipline, which he often required, and that his presence led to an inharmonious working of the hospital."). While the Maryland Court of Appeals in *Levin* noted that a state statutory scheme could limit a hospital's discretion in making these determinations, *see Levin*, 186 Md. at 180, 46 A.2d 298, the state regulations at issue in this case simply allow private hospitals to continue to do what they had a right to do at common law—to use discretion in determining which physicians may practice at the hospital, while *ensuring* that hospitals collect and analyze information about the physician's skills, adherence to hospital rules, and ability to work with others, among other things. *See* COMAR 10.07.01.24(E). In fact, the Fifth Circuit, in upholding a state statute authorizing hospitals to make decisions regarding the termination or suspension of hospital privileges, made exactly this point, stating that "[c]learly, private hospitals had at common law a right to revoke the staff privileges of physicians for good cause. This legislation simply authorizes action which is already legal, and requires additionally only that the hospital comply with its own bylaws in making staff decisions." *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir.1989). Therefore, the Maryland state regulation codifies a right that private hospitals have always had at common law, and, if anything, limits, rather than expands, a hospital's discretion, by requiring hospitals to collect and review certain information about the physician before making reappointment decisions.

Dr. Freilich argues, nonetheless, that "attitudes, cooperation, and ability to work with others" have nothing to do with patient care, and therefore, a hospital should not be permitted by law to make a termination decision on this basis. She is wrong. First, the regulation in no way requires or suggests that a hospital should use cooperation and ability to work with others as the sole basis for denying medical staff privileges to a physician. To the contrary, these criteria are among a list of several factors hospitals are required to review. Secondly, most courts that have considered the use of such criteria as attitude and cooperation have upheld the hospital's use of these criteria in making appointment decisions, while adhering to the premise that courts should not interfere

with the substantive credentialing decisions of private hospitals.

For example, in *Sosa v. Board of Managers of Val Verde Memorial Hospital*, 437 F.2d 173 (5th Cir.1971), the court determined that any review by a court of a hospital's decision regarding staffing privileges must be very narrow, in light of the wide discretion hospitals are afforded in making privileges decisions. *Id.* at 177. The court stated that a court's responsibility in these cases is to "assur[e] that the qualifications imposed by the Board are reasonably related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere." *Id.* In considering the hospital's criteria for appointment, the court concluded that "standards such as 'character qualifications and standing' are very general, but this court recognizes that in the area of personal fitness for medical staff privileges precise standards are difficult if not impossible to articulate.... The subjectives of selection simply cannot be minutely codified." *Id.* at 176. *See also Toussaint v. Laurens County Health Care System*, 857 F.2d 1469, 1988 WL 92900 (4th Cir.1988) (quoting *Sosa* and finding that county hospital did not deprive physician of substantive or procedural due process when it made a decision affecting his hospital privileges based on what the plaintiff alleged "were impermissibly vague and arbitrary/non-existent" standards).

Courts across the country have upheld bylaws that require hospitals to consider the same factors that Maryland's regulation requires to be reviewed and considered. These courts have consistently found factors such as attitude and ability to work with others to be rationally related

to patient care and not unconstitutionally vague or arbitrary. *See, e.g., Mahmoodian v. United Hosp. Center, Inc.*, 185 W.Va. 59, 67–68, 404 S.E.2d 750 (1991) (finding that medical staff bylaws that "proscribe professional conduct which is 'disruptive to the operations of the hospital,' and ... require a medical staff member to have 'an ability to work with others'" provided a "reasonably definite standard of professional conduct"); *Yashon v. Hunt*, 825 F.2d 1016, 1027 (6th Cir.1987) (finding that a physician's "unprofessional conduct, incompatibility and lack of cooperation on a hospital staff are appropriate considerations for denying staff privileges"); *Huffaker v. Bailey*, 273 Or. 273, 279, 540 P.2d 1398 (1975) (finding that "'a high quality of medical care' is not an impermissibly vague standard and that the applicant's ability to work with others is a legitimate consideration reasonably related to the quality of patient care."). The *Mahmoodian* court also concluded that:

> an ability to work with other health care personnel at the hospital, is a matter of legitimate concern to a hospital in making medical staffing decisions. Consequently, virtually all of the courts addressing the issue have held, and this Court hereby holds, that a hospital may adopt and enforce a medical staff bylaw providing that the disruptive conduct of a physician, in the sense of his or her inability to work in harmony with other health care personnel at the hospital, is a ground for denying, suspending, restricting, refusing to renew or revoking the staff appointment or clinical privileges of the offending physician, when such inability may have an adverse impact upon overall patient care at the hospital.

*Id.* at 68–69, 404 S.E.2d 750. Therefore, the state regulation itself, which requires hospitals to consider the physician's ability to work with others, and mirrors the lan-

guage of bylaws upheld in the majority of courts, does not violate due process.[6] The regulation is rationally related to patient care, and it more than reasonably notifies physicians of the type of conduct that might cause a denial of their hospital privileges.

### 2. *Equal Protection*

■ Dr. Freilich further alleges that the "vague criteria" regarding attitude and co-operation in the regulation cannot be applied uniformly, and, thus, the regulation violates the Equal Protection Clause. She again argues that her privileges were terminated for her patient advocacy, which she characterizes as a violation of her fundamental right to free speech, and she also alleges that she was the victim of sex discrimination, arguing that the hospital allegedly treated male physicians more favorably than female physicians in the credentialing process. As discussed above, this Court need only consider whether the state regulation violates the Equal Protection Clause on its face, because the hospital's decision cannot be attributed to the state. The Supreme Court has consistently held that "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 319–320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citations omitted).

There is nothing in the challenged regulation that requires the hospital to treat one physician differently from another physician based on speech or gender. Furthermore, the regulation makes no classification allowing some to speak, but not others. *See American Constitutional Law Foundation, Inc. v. Meyer*, 120 F.3d 1092, 1100 (10th Cir.1997). Therefore, the regulation will be upheld if it is rationally related to a legitimate governmental purpose. The regulation requires hospitals to collect and analyze information on a physician's clinical skills, adherence to hospital rules, attitude, cooperation, and ability to work with others, among other things. Such regulation of the physician reappointment process is rationally related to the state's interest in quality health care. Moreover, requiring hospitals to collect information on a physician's attitude, cooperation, and ability to work with others is rationally related to the goal of quality health care, in that professional conduct and staff cooperation are essential to a hospital's ability to deliver quality patient care. To reach such a conclusion takes only common sense—for legal authority, if needed, *see* cases cited, *supra*, discussing due process. Therefore, the regulation does not violate the Equal Protection Clause.

## II. The Constitutionality of the Health Care Quality Improvement Act (HCQIA)

Dr. Freilich alleges in Count II that the Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.*, is unconstitutional

---

**6.** Dr. Freilich has also alleged that Maryland's regulation violates Article 24 of the Maryland Constitution. The regulation is valid under the Maryland Constitution for the same reasons it is valid under the U.S. Constitution, as the Maryland Court of Appeals "consider[s] guarantees in the Declaration of Rights to be in *pari materia* with similar provisions of the

federal constitution ... and appl[ies] the same standards whether the claim alleges violation of a state or federal constitutional right." *Patterson v. State*, 356 Md. 677, 694, 741 A.2d 1119 (1999) (citing *Ogrinz v. James*, 309 Md. 381, 394 n. 3, 524 A.2d 77 (1987)). In any event, this is not a federal question.

on its face, and as applied to her, depriving her of her rights to due process and equal protection under the Fourteenth Amendment. (The Court notes that this equal protection and due process challenge to the HCQIA, a federal law, is actually a claim under the Fifth Amendment, and not under the Fourteenth Amendment, as the Fourteenth Amendment applies only to the states. *See International Science & Tech. Inst., Inc. v. Inacom Communications, Inc.*, 106 F.3d 1146, 1156 (4th Cir.1997)). Specifically, Dr. Freilich argues that the statute (among the seventeen issues that she details) does not provide for independent judicial review when its procedures are not followed, permits the denial of physician privileges on such grounds as "attitude," immunizes a professional review body from damages liability when that body denies privileges based on such grounds, fails to provide a private right of action, and contains vague and ambiguous language such as "reasonable effort" and "reasonable belief" that denies physicians both due process and equal protection. She further argues in Count III that the HCQIA's qualified immunity for medical peer review violates the Tenth Amendment of the United States Constitution and Article Three of the Maryland Constitution by invading areas of law that have been traditionally left to regulation by the states, specifically by immunizing conduct that would be otherwise actionable under state law.[7]

### A. Due Process and Equal Protection

 As an initial matter, Dr. Freilich's claim that the HCQIA violates her right to due process and equal protection under the Fifth Amendment must be dismissed against the private hospital defendants, because the Fifth Amendment restricts only actions of the federal government, and not actions of private parties. *See Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 461–62, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). Just as there must be state action to assert a Fourteenth Amendment claim, there must be some type of federal action to assert a claim under the Fifth Amendment due process clause. *See Miller v. Hartwood Apartments, Ltd.*, 689 F.2d 1239, 1242–43 (5th Cir.1982) (applying state action test to determination of whether federal action existed for purposes of establishing Fifth Amendment violation); *Gilmore v. Salt Lake Community Action Program*, 710 F.2d 632, 635–36 (10th Cir.1983)(requiring federal action to assert Fifth Amendment due process violation). As explained above, the actions of HMH and the individual hospital defendants do not rise to the level of state or federal action, and the fact that Dr. Freilich's peer reviewers may seek immunity through a state or federally enacted statute does not turn a purely private decision into that of the state or federal government. *See Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1034 (9th Cir.1989) (finding that a private hospital's decision to terminate a physician's staff privileges was not converted into state action because the decision was made pursuant to a state-mandated peer review process); *Ezpeleta v. Sisters of Mercy Health Corp.*, 800 F.2d 119, 122–23 (7th Cir.

---

**7.** In her response to the defendants' motions to dismiss, Dr. Freilich also asserts a new claim—that Md.Code Ann., Cts. and Jud. Proc. § 5–637, which provides immunity for members of peer review committees as long as they act in good faith, is unconstitutional. This Court will not consider this new challenge to the Maryland state statute in the absence of an amended complaint. Even if it was properly before the Court, however, it would be dismissed for the same reasons, as both Maryland's statute and the HCQIA are constitutional.

1986) (same); *see also Boyer v. LeHigh Valley Hospital Center, Inc.,* 1990 WL 94038, at 3 (E.D.Pa.1990) (rejecting argument that adherence to the HCQIA supplies the requisite federal action).

Furthermore, the Secretary of the United States Department of Health and Human Services played absolutely no part in the decision to deny Dr. Freilich's reappointment to HMH, thus suggesting that there is no federal action to support this claim. Dr. Freilich concedes as much when she asserts in her briefing to this Court that she is not stating a claim under the Fifth Amendment, but rather, has named "the Government [as] a defendant simply because it is in the best position to defend a constitutional challenge to this statutory scheme." *See* Pl.'s Opp'n to Federal Gov't's Mot. to Dismiss at 8. In addition to this lack of federal action, Dr. Freilich's claim raises standing and ripeness concerns. Specifically, it is questionable whether Dr. Freilich's injury—the termination of her hospital privileges—is traceable to the provisions of the HCQIA, as Dr. Freilich has not demonstrated how the HCQIA has been applied to her, if at all. Furthermore, the HCQIA has yet to be applied to provide or deny immunity to the individuals against whom she has brought this case. However, even assuming that the federal government is the best party to defend the constitutionality of the HCQIA, and that this is sufficient for federal action, *see supra* note 5, and even assuming that the claim is justiciable, the bottom line is that the Act is clearly constitutional.

■ The HCQIA grants limited immunity to those who take part in peer review activities if certain due process standards are met. The Act immunizes these professional review actions from damages liability only and does not extend to any claim alleging a civil rights violation or to claims for declaratory or injunctive relief. 42 U.S.C. § 11111. In enacting the HCQIA, Congress sought "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 99–903, 99th Cong.2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 6384, 6384. Congress further found that the threat of damages liability to those engaged in medical peer review activities discouraged many physicians from participating in such review, and accordingly the HCQIA provides for damages immunity if certain requirements are met. *See* 42 U.S.C. § 11101(4). *See also Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318, 1321–1323 (11th Cir.1994).

Even assuming that the provisions of the HCQIA have been applied to Dr. Freilich, the HCQIA does not violate due process or equal protection. Because the HCQIA does not implicate any fundamental right, nor does it make any classifications based on any suspect class (or any other basis for that matter), it must be reviewed under a rational basis standard, and it will generally be presumed valid. *See Mitchell v. Commissioner of the Social Security Administration,* 182 F.3d 272, 274 (4th Cir.1999) (citing *City of Cleburne, Texas v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). The limited peer review immunity provided in the HCQIA, if certain fairness and procedural requirements are met, rationally serves Congress' goal of improving the quality of the nation's medical care by ensuring that physicians participate in efforts to discipline incompetent or unprofessional physicians. Improving the quality of the nation's medical care is certainly a legitimate end of the federal government. Even if Congress erred in assuming that peer immunity will lead to

more effective peer review, which will lead to improved health care, its rationale is certainly tenable, and is therefore sufficient under a rational basis standard of review. *See Heller v. Doe,* 509 U.S. 312, 333, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

Dr. Freilich next alleges that the statute is unconstitutionally vague in violation of the Due Process Clause, an argument similar to the one she made in connection with Maryland's physician reappointment regulation. The Due Process Clause requires that a statute must "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and must provide adequate guidance to those enforcing its provisions. *Hill v. Colorado,* 530 U.S. 703, 732–33, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). First, the provisions of the HCQIA are not enforcement standards which are required to be used against physicians. The statute merely sets standards for health care professionals who engage in peer review and who seek immunity. Therefore, the HCQIA should not be subject to the higher level of scrutiny that a criminal statute or regulatory enactment would require. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

In *Varandani v. Bowen,* 824 F.2d 307 (4th Cir.1987), the Fourth Circuit considered a physician's vagueness challenge to a federal statute regulating treatment of Medicare patients and authorizing suspension of physicians providing care to Medicare patients. The Court found that the statute's codification of adequate medical care as "of a quality which meets professionally recognized standards of health care" was not unconstitutionally vague, concluding that "the definition of adequate medical care cannot be boiled down to a precise mathematical formula; it must be grounded in what, from time to time, other health professionals consider to be acceptable standards of health care." *See id.* at 311–12. Similarly, the HCQIA language, "in the reasonable belief that the action was taken in furtherance of quality health care" is, for the same reasons, not unconstitutionally vague, as it merely provides some discretion to health care professionals, discretion that courts and legislatures have up to this point declined to disturb. In addition, in *McLean Trucking Co. v. Occupational Safety & Health Review Comm'n,* 503 F.2d 8 (4th Cir.1974), the Fourth Circuit concluded that a federal regulation that employed an external, objective test in the area of regulation of workplace hazards was not void for vagueness, stating that "[i]n effect the legislative and regulatory standards call for the 'reasonable man' test and the application of this classic criterion eliminates to a large degree the alleged facial vagueness." *Id.* at 11. Likewise in adopting an objective reasonableness test, the HCQIA provides a standard that provides physicians participating in peer review notice that their conduct must conform to certain requirements in order for them to take advantage of the limited immunity provided by the statute.

In evaluating Dr. Freilich's challenges to the procedures provided by the HCQIA, this Court must, as it did in evaluating the substantive due process issue above, give great deference to the judgment of Congress. *See Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 319–320, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). Even assuming that Dr. Freilich has a liberty or property interest in her medical privileges, this statute does not attempt to set out what process she is due before she can be deprived of that interest. Rather, the HCQIA requires that a professional review action be taken "after adequate

notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances" before a peer review body or its members may be provided with immunity. 42 U.S.C. § 11112(a)(3). Furthermore, nothing in the statute limits Dr. Freilich's ability to obtain judicial review by challenging the adequacy or fairness of the procedures used by HMH when HCQIA immunity is invoked as a defense. *See, e.g., Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318 (11th Cir.1994); *Imperial v. Suburban Hosp. Ass'n, Inc.,* 862 F.Supp. 1390 (D.Md.1993), *aff'd* 37 F.3d 1026 (4th Cir.1994); *Bender v. Suburban Hosp., Inc.,* 134 Md.App. 7, 758 A.2d 1090 (2000).

Moreover, nothing in the HCQIA deprives or limits the amount of process a physician is due. Rather, the Act continues the long-standing practice of providing hospital boards with discretion to make decisions on matters upon which they possess special expertise, while ensuring that certain procedural safeguards are followed before immunity is provided. *See Bryan,* 33 F.3d at 1337 (" '[T]he intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise.' " (quoting *Mahmoodian v. United Hosp. Ctr., Inc.,* 185 W.Va. 59, 404 S.E.2d 750 (1991))). Therefore, the limitations that the Act imposes to ensure that professional peer review is procedurally fair before immunity is granted do not run afoul of the due process clause of the Fifth Amendment.

### B. Tenth Amendment

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. X. In determining whether a statute violates the Tenth Amendment, courts " 'ask two questions . . . [f]irst, whether the regulation it embodies is within Congress' power as being within those enumerated in the Constitution . . . . [and] [s]econd, whether, even if so, the means of regulation employed yet impermissibly infringe upon state sovereignty.' " *United States v. Bostic,* 168 F.3d 718, 723–24 (4th Cir.1999) (quoting *United States v. Johnson,* 114 F.3d 476, 480 (4th Cir.1997)) (citing *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)).

First, the HCQIA is clearly valid as an exercise of Congress' power to regulate interstate commerce under the Commerce Clause. In fact, the U.S. Supreme Court has said so, albeit in the context of considering whether a sufficient nexus with interstate commerce existed for Sherman Act jurisdiction, when the Court concluded that "[w]e have no doubt concerning the power of Congress to regulate a peer review process controlling access to the market for ophthalmological surgery in Los Angeles." *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 332–33, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). In reaching its decision that the plaintiff alleged a sufficient nexus with interstate commerce, the Court noted that "[r]eports concerning peer review proceedings are routinely distributed across state lines and affect doctors' employment opportunities throughout the Nation." *Id.* at 327–28, 111 S.Ct. 1842.

As discussed earlier in this opinion, Congress enacted the HCQIA to remedy what it believed to be nationwide problems regarding the quality of medical care and the increased occurrence of medical malpractice. *See* 42 U.S.C. § 11101(1). In its

statement of findings in the HCQIA, Congress determined that "[t]here is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance" 42 U.S.C. § 11101(2). To remedy these problems, the Act established a national reporting system which, among other things, requires hospitals to provide information about adverse professional review actions, 42 U.S.C. § 11133, and provides immunity from damages for persons participating in peer review if certain standards are satisfied, 42 U.S.C. §§ 11111, 11112.

In upholding the constitutionality of the Freedom of Access to Clinic Entrances Act (FACE) under the Commerce Clause, the Fourth Circuit concluded, in *Hoffman v, Hunt,* 126 F.3d 575 (4th Cir.1997), that the Act's regulation of the use of force against persons who are obtaining or providing reproductive health care services, while "not itself commercial or economic in nature, [ ] is closely connected with, and has a direct and profound effect on, the interstate commercial market in reproductive health care services." *Id.* at 587. The court relied on the Act's legislative history which noted, that "facilities providing these services retain staff in an interstate employment market and utilize supplies obtained through interstate commerce .... " *Id.* Similarly, and even more directly connected with the actual regulation of interstate medical services, the HCQIA's legislative history indicates that its reporting system "would virtually end the ability of incompetent doctors to skip from one jurisdiction to another." H.R.Rep. No. 99–903, 99th Cong.2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 6384, 6385. In addition, Congress felt that the peer re-

view immunity in the statute would make the reporting system workable, concluding that without it, peer reviewers "sufficiently fearful of the threat of litigation will simply not do meaningful peer review." *Id.* The HCQIA, which clearly has an even stronger connection to interstate commerce than FACE, as it directly affects the interstate commercial market in health care services, is therefore a valid exercise of Congress' power under the Commerce Clause.

 Secondly, the HCQIA does not impermissibly infringe upon state sovereignty. *See Bostic,* 168 F.3d at 723–24. Dr. Freilich alleges in her Complaint that "[b]y immunizing conduct declared actionable by both the General Assembly and courts of the State of Maryland in an area of legitimate state concern, Congress exceeded its power in enacting 42 U.S.C. § 11111(a)(1)." Compl. at ¶ 133. In her Complaint, Dr. Freilich challenges only the immunity provisions as violating the Tenth Amendment, yet in her Opposition to the Motion to Dismiss, she challenges the requirement that state boards of medical examiners report to the National Practitioner Data Bank, alleging that the requirement wrongfully compels the state to act. Neither the immunity provisions nor the reporting requirements violates the Tenth Amendment.

First, the immunity provisions are valid under the Tenth Amendment because they command no legislative or executive action on the part of the State of Maryland. *See Reno v. Condon,* 528 U.S. 141, 151, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). In fact, the state of Maryland has its own peer review immunity statutes, Md.Code Ann., Cts. & Jud. Proc. § 5–637 and Health Occ. § 14–501(f),[8] which together provide

---

**8.** Section 14–501(f) provides *"Immunity from civil liability.*—A person shall have the immu-

nity from liability described under § 5–637 of the Courts and Judicial Proceedings Article

broader immunity to peer review boards than the HCQIA. *See Imperial v. Suburban Hosp. Assoc. Inc.*, 37 F.3d 1026, 1031–32 (4th Cir.1994); *Bender v. Suburban Hosp., Inc.*, 134 Md.App. 7, 34, 758 A.2d 1090 (2000); *Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 214, 680 A.2d 1067 (1996). Indeed, Congress was aware of the fact that most states already had in place statutes providing immunity to peer review activities, and concluded that, because the reporting requirements might increase the amount of litigation, and because some federal anti-trust actions had been used to "override those [state] protections," peer immunity was a necessary part of the statute. *See* H.R.Rep. No. 99–903, 99th Cong.2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 6384, 6391. Furthermore, the HCQIA provides that "nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than that provided by this subchapter." 42 U.S.C. § 11115(a). The Maryland Court of Appeals in *Goodwich* stated its view on the interplay of the state and federal peer review immunity statutes, stating that "because the Maryland statute requires that a member of a review committee act in good faith, while the HCQIA employs objective standards of reasonableness, '[t]he State law ... may, *in some circumstances*, provide additional immunity or protection to medical review bodies. The State law is preempted by the Federal only to the extent that it provides *less* immunity than

the Federal, not to the extent it provides *more*.' " *Goodwich*, 343 Md. at 214, 680 A.2d 1067 (quoting *Goodwich v. Sinai Hosp.*, 103 Md.App. 341, 355, 653 A.2d 541 (1995)). In addition, Maryland's statute extends to all civil liability, while the HCQIA only applies to damages. Therefore, contrary to the allegations in Dr. Freilich's Complaint, the HCQIA's peer immunity provision hardly immunizes conduct declared actionable by the General Assembly, as the General Assembly itself has enacted a law providing what, in some circumstances, is broader immunity for those engaged in medical peer review. It certainly does not require the state to do anything that the state itself has not already required, authorized, or provided by its own legislative command.

■ Perhaps realizing that the immunity provision upon which she based her Tenth Amendment argument in the Complaint would likely withstand constitutional scrutiny, Dr. Freilich argues in her Opposition to the Motion to Dismiss that the reporting requirements in the HCQIA, particularly the part of the statute that requires each state Board of Medical Examiners to report information provided to them by health care entities to the National Practitioner Data Bank, 42 U.S.C. § 11133(b), violates the Tenth Amendment. She argues that this requirement improperly compels states to implement federal regulatory programs. This statutory requirement hardly "commandeers" the legislative or executive branches of the Maryland state government. *Hodel v. Virginia Surface Mining & Reclamation Assoc., Inc.*, 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). The statute

for any action as a member of the medical review committee or for giving information to, participating in, or contributing to the function of the medical review committee." Section 5–637(b) provides that "[a] person who acts in good faith and within the scope of

the jurisdiction of a medical review committee is not civilly liable for any action as a member of the medical review committee or for giving information to, participating in, or contributing to the function of the medical review committee."

requires the health care entities themselves to collect and report the information to the state board of medical examiners. 42 U.S.C. § 11133(a). The board of medical examiners is then required to forward that information to the federal data bank. 42 U.S.C. § 11133(b). This Court has found no case finding that this statutory command· commandeers the state, and many cases that have enforced the requirements of the statute. Indeed, under the Supreme Court's most recent jurisprudence on the Tenth Amendment in a similar context, the claim is completely meritless. *See Reno v. Condon,* 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000).

Furthermore, Dr. Freilich has made no showing that requiring state medical boards to forward information on to a national data bank would be burdensome or would impede state sovereignty. The HCQIA's reporting requirement does nothing to impede the State of Maryland's control over the licensing or discipline of physicians in the state. It does not tell the state how to regulate, nor does it prohibit or prevent the state from regulating physicians. It merely requires the state to forward information to a national data bank that the state already collects on its own under its own state laws. *See* Md.Code Ann., Health Occ., §§ 14–411, 14–413; *see also Goodwich,* 343 Md. at 194 n. 11, 680 A.2d 1067. The additional reporting requirement is merely an incident to the state's regulation of physicians and in no way commandeers their authority. *See FERC v. Mississippi,* 456 U.S. 742, 770 n. 33, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (noting that reporting requirements imposed on state commissions are supportable if a state chooses to regulate in that field). The federal government has not compelled the states to enact or enforce a federal regulatory program—rather, the

government is asking the states to provide information regarding their own state administered regulatory programs. This has never been held to violate the Tenth Amendment, and this Court declines to do so today.[9] *See South Carolina v. Baker,* 485 U.S. 505, 514–515, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988) ("Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.").

### III. ADA & Federal Rehabilitation Act

In Counts VI and VII, Dr. Freilich brings several claims under the Americans with Disabilities Act (ADA) and the Federal Rehabilitation Act (RA) against HMH and the individual defendants who participated in her peer review. First, Dr. Freilich brings an action on behalf of dialysis patients at the hospital, alleging that the hospital discriminated against them by denying them equal enjoyment of medical treatment in violation of Title II of the ADA, 42 U.S.C. § 12132 and by providing them different services from non-disabled patients in violation of Title III, 42 U.S.C. § 12182. Next, Dr. Frelich asserts a claim for associational discrimination under Title III, 42 U.S.C. § 12182(b)(1)(E). Finally, Dr. Freilich alleges that HMH violated Title V of the ADA, 42 U.S.C. § 12203(a) by retaliating against her because of her advocacy on behalf of dialysis patients. Dr. Freilich brings similar claims under the Federal Rehabilitation Act, claiming alleged discrimination against dialysis patients and retaliation because of her advocacy on behalf of these patients under 29

9. The HCQIA likewise does not violate Article 3 of the Maryland Declaration of Rights.

U.S.C. § 794. The ADA and RA claims will be considered together. *See Ennis v. National Association of Business and Educational Radio, Inc.*, 53 F.3d 55, 57 (4th Cir.1995) ("To the extent possible, we adjudicate ADA claims in a manner consistent with decisions interpreting the Rehabilitation Act.").

The hospital defendants moved to dismiss the discrimination claims under the ADA and the RA, and at the direction of this Court, later moved to dismiss the associational discrimination and retaliation claims. The motion to dismiss all of the claims under the ADA and the RA must be granted because, as an initial matter, the conduct described in Dr. Freilich's Complaint is not actionable under the ADA or the RA.

Dr. Freilich alleges that contractors perform many of the services provided at the hospital. She alleges further that HMH provides in-hospital quality assurance and oversight for all services provided by contractors at the hospital (pathology, psychiatry, radiology, for example) except for dialysis services. As a result, oversight and quality assurance for dialysis patients is conducted by the contractors, not the hospital, resulting in what Dr. Freilich alleges is substandard care for dialysis patients. *See* Compl. at ¶¶ 177–178, 184–186. By making this allegation, Dr. Freilich is essentially arguing that it is discriminatory under the ADA to treat a group of disabled individuals (assuming dialysis patients are disabled as defined by the Act) differently than all other patients at the hospital, who are arguably also disabled individuals.

Case law makes clear that the ADA and the RA do not provide a remedy for variability in the way oversight and quality assurance is conducted in a hospital setting where *any* patient could be disabled, and many obviously are. "[T]he disabilities

statutes do not guarantee any particular level of medical care for disabled persons, nor assure maintenance of service previously provided." *Cercpac v. Health and Hospitals Corp.*, 147 F.3d 165, 168 (2nd Cir.1998). *See also Traynor v. Turnage*, 485 U.S. 535, 549, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) ("There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons."); *N.A.M.I. v. Essex County Board of Freeholders*, 91 F.Supp.2d 781, 788 (D.N.J.2000); *Rome v. MTA/New York City Transit*, 1997 WL 1048908, *4 (E.D.N.Y.1997) ("Merely distinguishing among disabilities does not constitute discrimination under the ADA."). In *Lewis v. Kmart Corp.*, 180 F.3d 166 (4th Cir. 1999), the Fourth Circuit extended its holding in *Rogers v. DHEC*, 174 F.3d 431 (4th Cir.1999), to conclude that the ADA does not require an employer's long-term disability benefit plan to provide equal benefits for mental and physical disabilities. *See Lewis*, 180 F.3d at 170. The court initially noted that "the Supreme Court has never held that is unlawful under the ADA or the Rehabilitation Act to give preferential treatment to one disability over another." *Id.* at 171. Finally, the court concluded that "our federal disability statutes are not designed to ensure that persons with one type of disability are treated the same as persons with another type of disability." *Id.* at 171–72. Therefore, because Dr. Freilich has alleged only a difference in the way oversight and quality assurance is provided among hospital patients (who are arguably all disabled), she fails to make the showing, as the statutes require, that the treatment of the dialysis patients involves any difference in treatment between the disabled and the non-disabled. Even assuming that the conduct alleged does constitute a violation

of the ADA, Dr. Freilich's claims for discrimination, associational discrimination, and retaliation would still be dismissed, for the reasons that follow.

## A. Discrimination Claims under the ADA and the FRA

■ First, Dr. Freilich seeks to bring an ADA discrimination claim on behalf of the dialysis patients at the hospital. However, she lacks standing to assert the rights of her dialysis patients. In addition to the constitutional standing requirements of injury, traceability, and redressability, courts impose prudential limitations on standing. One of the prudential rules of standing requires a litigant to assert his or her own legal rights, and not those of a third party. *See Singleton v. Wulff,* 428 U.S. 106, 112–113, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). However, courts will recognize third-party standing if certain requirements are satisfied. In order for a plaintiff to bring a cause of action on behalf of third parties, the plaintiff must satisfy three requirements. First, the "litigant must have suffered an injury in fact, ... the litigant must have a close relation to the third party, and there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (internal citations and quotations omitted). Even assuming that Dr. Freilich has suffered an injury in fact—that her privileges were terminated, and that there exists a close doctor/patient relationship between Dr. Freilich and the dialysis patients, Dr. Freilich's Complaint contains no indication that her unnamed dialysis patients could not have brought suit on their own behalf. Third-party standing is permitted "only where more 'daunting' barriers deterred the rightholder." *Miller v. Albright,* 523 U.S. 420, 449, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (quoting *Powers,* 499 U.S. at 414, 111 S.Ct. 1364).

In a case similar to this one, the Seventh Circuit found that a physician did not have standing to bring a claim on behalf of his inmate-patients, because the physician failed to alleged that there existed an obstacle to the patients asserting their own rights. *See Massey v. Helman,* 196 F.3d 727, 741–42 (7th Cir.1999). In *Massey,* the court properly distinguished the Supreme Court's decision in *Singleton,* cited *supra.* In *Singleton,* the Court found that physicians had standing to assert the rights of abortion patients who were limited in their ability to bring suit by privacy and mootness issues. *See Massey,* 196 F.3d at 741. Unlike these abortion patients, and like the inmate-patients at issue in *Massey,* the dialysis patients and indigent patients on whose behalf Dr. Freilich advocated are not constrained in bringing suit by any obstacles made known in the Complaint. Therefore, finding that there is no barrier to these patients bringing ADA claims on their own, beyond the barrier of being without a legally cognizable claim under the disability statutes, Dr. Freilich lacks standing to bring suit against the defendants under the ADA on behalf of her patients. *See also Fobbs v. Holy Cross Health Sys. Corp.,* 29 F.3d 1439, 1448 (9th Cir.1994), *overruled on other grounds,* 241 F.3d 1131 (9th Cir.2001) (en banc) (finding that physician lacked standing to assert civil rights violation on behalf of patients, as the physician failed to explain "why *he,* rather than his patients, should receive money damages for injury inflicted on his patients."). Therefore, Dr. Freilich's ADA and RA "direct" discrimination claims are dismissed.

## B. Associational Discrimination Claim under the ADA

■ Dr. Freilich next asserts a claim under the associational discrimination pro-

vision of Title III of the ADA, 42 U.S.C. § 12182(b)(1)(E), alleging that HMH discriminated against her by denying her equal use of facilities, privileges, and advantages because of her association with dialysis patients at the hospital. *See* Compl. at ¶ 180. A similar provision in Title I of the ADA governs associational discrimination in employment, 42 U.S.C. § 12112(b)(4). The Court assumes that Dr. Freilich did not allege a violation of the Title I provision because she was not an "employee" of the hospital for purposes of claims brought under Title I, and therefore she chose to proceed under Title III. *See Menkowitz v. Pottstown Memorial Medical Center*, 154 F.3d 113, 122–123 (3rd Cir.1998). However, because of the lack of case law applying the Title III association provision, case law interpreting the Title I provision is applicable, particularly because this case involves a denial of privileges associated with Dr. Freilich's occupation. *See* H.R.Rep. No. 101–485, 101st Cong 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 481 (noting that the protection found in the Title III provision is analogous to that provided in Title I).

In *Oliveras–Sifre v. Puerto Rico Dept. of Health*, 214 F.3d 23 (1st Cir.2000), a case strikingly similar on its facts to this case, the First Circuit affirmed a lower court's decision that individuals who advocated on behalf of AIDS patients failed to state a claim under the "association provision" of the ADA, 42 U.S.C. § 12112(b)(4). *See id.* at 26. In *Oliveras–Sifre,* the court found that because the individuals did not allege a specific association with a specific individual, but instead alleged that they were advocating on behalf of AIDS patients in general, that their claim did not fit within the associational discrimination framework. *See id.* In support of its decision, the court looked to the legislative history of the statute and the EEOC inter-

pretive guidance which made clear that the provision was meant to prevent " 'unfounded stereotypes and assumptions' arising from the employees' relationships with particular disabled persons." *Id.* (internal citation omitted). According to the guidance, this would include adverse employment decisions taken based on an employer's belief that an employee would have to miss work to care for a disabled relative, or because the employee might do volunteer work for AIDS patients and the employer is fearful of contracting the disease. *See id.* (citing 29 C.F.R. § 1630.8, App. at 360). Thus, because the complaint alleged that the plaintiffs were dismissed because of their advocacy, and not because of any beliefs the defendants held regarding the AIDS patients with which the plaintiffs were associated, the court determined that the associational discrimination claim should be dismissed. *See Oliveras Sifre v. Department of Health,* 38 F.Supp.2d 91, 101 (D.P.R.1999), *aff'd* 214 F.3d 23 (1st Cir.2000).

Similarly, in *Barker v. International Paper Co.,* 993 F.Supp. 10, 15 (D.Me.1998), the only reported case other than *Oliveras–Sifre* that this Court could find where a plaintiff brought a claim under the ADA for associational discrimination based on the plaintiff's alleged advocacy on behalf of disabled individuals, the Court granted summary judgment in favor of the defendant employer where the plaintiff alleged that he was terminated because of his advocacy on behalf of his disabled wife. The court concluded that the plaintiff's claim would best be brought as one for retaliation under Title V, Section 12203, and not as a claim for associational discrimination. *See id.* at 15. *See also Lester v. Compass Bank,* 1997 WL 151782, at *3 (N.D.Ala.1997) (concluding that plaintiff's claim brought as an individual who "champions the cause of a disabled *indi-*

*vidual*" (emphasis added) may be one for retaliation under the ADA, but is not properly brought under the association provision of the ADA).

The interpretive guidance related to the association provision found in Title III states that it would be a violation of the section "for a day care center to refuse admission to a child because his or her brother has HIV disease" or for "a place of public accommodation [to refuse] admission to a person with cerebral palsy and his or her companions" or to "seek to evict a health care provider because that individual or entity provides services to persons with mental impairments." *See* 28 C.F.R. § 36.205, App. B, at 634. Just as the AIDS advocates' conduct in *Oliveras–Sifre* did not fit within the framework of the associational provision of Title I, Dr. Freilich's advocacy on behalf of dialysis patients does not fit within the framework of the analogous provision in Title III. For example, Section 12182(b)(1)(E) has been held to apply to the denial of a zoning request or a denial of funding to a facility that treats disabled patients, *see e.g., Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37 (2nd Cir.1997); *Pathways Psychological Support Center v. Town of Leonardtown,* 1999 WL 1068488, at * 2–3 (D.Md.1999), and to a refusal to extend life insurance to a non-disabled person who associated with an HIV-positive individual. *See e.g., Cloutier v. Prudential Ins. Co. of America,* 964 F.Supp. 299 (N.D.Cal.1997). These applications are consistent with the statute's purpose as explained in the interpretive guidance. Nowhere in the interpretive guidance is it suggested that this provision was meant to protect patient advocacy, and no case has

allowed an associational discrimination claim to go forward on such grounds. Therefore, the claim will be dismissed. Dr. Freilich's claim under the Rehabilitation Act will likewise be dismissed, as it is to be analyzed under the same standards as the ADA claim. *See Oliveras—Sifre,* 214 F.3d at 25 n. 2; *Barker,* 993 F.Supp. at 14 (citing 29 U.S.C. § 794(d)).

### C. Retaliation

 Finally, Dr. Freilich alleges that she was retaliated against in violation of Title V of the ADA, 42 U.S.C. § 12203. In order to properly assert a retaliation claim, a plaintiff must show that: (1) she engaged in protected conduct; (2) that she was subjected to an adverse employment decision; and (3) that a causal link exists between the protected conduct and the adverse employment decision. *See Oliveras–Sifre,* 214 F.3d at 26; *see also Gibson v. Old Town Trolley Tours of Washington D.C., Inc.,* 160 F.3d 177, 180 (4th Cir.1998) (setting forth the elements of a Title VII retaliation claim). Even assuming that Dr. Freilich's privileges were terminated because of the hospital's opposition to her concerns over the treatment of dialysis patients, she cannot establish the first element essential to her retaliation claim— that she was engaged in protected conduct by opposing an act or practice made unlawful by the ADA.[10] *See* 42 U.S.C. § 12203. In *Oliveras—Sifre,* the court concluded that the AIDS advocates' retaliation claim was properly dismissed by the district court because the plaintiffs failed to demonstrate that their advocacy was at all related to conduct prohibited by the ADA. *Oliveras–Sifre,* 214 F.3d at 26–27.

---

**10.** Section 12203 also prohibits discrimination against a person for participating in an investigation, proceeding, or hearing under the ADA. Dr. Freilich does not allege that she was involved in any ongoing ADA investiga-

tion at the time she was protesting the treatment of the dialysis patients. *See Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir.1998).

Likewise, in this case, no reasonable person could perceive that the ADA makes it unlawful for a hospital to perform quality assurance in a different manner for dialysis patients than it does for other patients, who are also highly likely to be disabled, and who are also treated by outside contractors. First, this Court seriously questions whether the provision of in-hospital quality assurance is a good, service, or advantage that dialysis patients do not receive in violation of the ADA. It seems more to be a service rendered to the hospital and practitioners. Secondly, as was discussed above, the Complaint fails to allege that the dialysis patients were denied care made available to non-disabled patients. Rather, the other groups of patients who Dr. Freilich alleges were treated differently were being provided such services as "emergency critical care medicine, radiology, anesthesiology, pathology and psychiatry" and were likely just as disabled, or more so, as her dialysis patients. *See* Compl. at ¶ 177. This is *not* evidence, as Dr. Freilich suggests, that the dialysis patients were denied any service, or that they were not placed in "the most integrated setting appropriate," or that the hospital utilized standards or criteria or methods of administration that have a discriminatory effect. *See* 42 U.S.C. § 12182(b)(1)(B) [11] & 12182(b)(1)(D).

While an underlying violation of the ADA is not required for a retaliation claim, it nonetheless must have at least been reasonable for Dr. Freilich to believe that the conduct she opposed constituted a violation of the disability statutes. *See Fitch v. Solipsys Corp.,* 94 F.Supp.2d 670, 678

(D.Md.2000). It was hardly reasonable for Dr. Freilich, nor would it be reasonable for any physician, to believe that any difference in the application of quality assurance techniques to services provided to groups of disabled individuals at a hospital would violate the ADA or the Rehabilitation Act. Moreover, the Fourth Circuit has made clear that the act of distinguishing between "protected opposition and unprotected obstreperousness," *Glover v. South Carolina Law Enforcement Division,* 170 F.3d 411, 415 (4th Cir.1999), requires a balancing of " 'the purpose of the Act to protect persons engaging reasonably in activities opposing` ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.' " *Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir.1981)(internal citation omitted). In view of this balancing, and the clear precedent holding that the disability statutes do not afford protection to the type of conduct alleged in the Complaint, Dr. Freilich's claim for retaliation must be dismissed. To hold any other way would open up the courts to claims by hospital patients and doctors based on minute differences in quality assurance and oversight between groups of patients within their facilities. This would be stretching the ADA far beyond its intended purpose, and this Court declines to do so.

## CONCLUSION

In light of the preceding analysis, a separate order will be issued granting the defendants' motions to dismiss all of the

---

11. This section applies to situations where certain patients are segregated from the community or from other patients, and does not cover the conduct alleged in this case. The case cited by Dr. Freilich, *Cable v. Department of Developmental Services of the State of California,* 973 F.Supp. 937 (C.D.Cal.1997), is therefore distinguishable, because it involved conduct which could arguably have been actionable under the ADA, as it involved a plaintiff's protests regarding a community placement program for the developmentally disabled.

federal claims in this case, Counts I, II, III, IV, VI, and VII, and there being no remaining federal claims, this Court will exercise its discretion under 28 U.S.C. § 1367(c)(3) to dismiss, without prejudice, Dr. Freilich's state law claims.